[No. 28434. *En Banc.* October 9, 1941.]

COWICHE GROWERS, INC., et al., *Appellants,* v. JACK E. BATES, *as Commissioner of Unemployment Compensation and Placement, et al., Respondents.*[1]

[1]Reported in 117 P. (2d) 624.

586

*Cheney & Hutcheson* and *Wendell W. Duncan,* for appellants.

*The Attorney General* and *William J. Millard, Jr., Assistant,* for respondents.

*Vanderveer, Bassett & Geisness, amicus curiae.*

JEFFERS, J.—Plaintiffs, Cowiche Growers, Inc., and Yakima County Horticultural Union, co-operative corporations, and sixteen other corporations and firms, filed in the superior court for Thurston county a complaint and amended complaint, for the purpose of obtaining a declaratory judgment defining their rights, duties, privileges, and liabilities under the unemployment compensation act, in so far as it concerns plaintiffs' employees, who are engaged in rendering the services described in the amended complaint. The prayer of the amended complaint further asks:

"(a) That the services rendered and labor performed by such of plaintiffs' employees as are de-

scribed in the complaint be adjudged to be agricultural labor within the meaning of the 'Unemployment Compensation Act' and, therefore, exempt from the operation of such act; and

"(b) That plaintiffs are entitled to a refund of all contributions paid upon the wages of such employees; and

"(c) That the failure of a plaintiff to have appealed from a benefit determination when notice of such determination has been given him does not affect either his right to a refund nor· the amount thereof."

In order that we may have before us the character of the services performed, it will be necessary to set out in detail the services described in the amended complaint. In the various paragraphs of the amended complaint, it is alleged:

"4. Each of the plaintiffs employs employees in receiving, washing, sorting, packing, and storing of fresh fruits as a necessary incident to the preparation of such fruits for market in their fresh or raw condition; and all of said fruits are delivered to carriers for transportation to market shortly after the completion of such services. The said services are necessary to be performed in order that such fruits may be marketed, and all of the said services are rendered to such fruits in their raw state."

"7. The said services rendered by such employees upon fresh fruits are as follows: (a) receiving of fruit at the plant and checking it in; (b) hand-trucking the fruit from the receiving platform either direct to the washing machine, or into cold storage to await washing, and then being hand trucked from storage to the washing machine; (c) running the fruit through a washer for the purpose of removing excess deposits of lead, arsenate, acid, and fluorine. The washing is made mandatory by the Pure Food and Drug Act of the United States and the regulations of the Department of Agriculture of the United States of America; (d) sorting the fruit into the various grades—in the case of apples, into extra fancy, fancy, 'C' grade, and culls. This sorting is required by the statutes of the

state of Washington and the rules and regulations of the Department of Agriculture of the state of Washington; (e) sizing the fruit, which is necessary in order to get the uniform sizes for packing, which is required and done according to the rules and regulations of the department of agriculture of the state of Washington; (f) packing the fruit into boxes, which packing is in accordance with the rules and regulations of the department of agriculture of the state of Washington, and in standard containers prescribed by the laws of the state of Washington; (g) lidding and labeling—, lidding the boxes is made necessary in order to ship said fruit to market, and labeling of the boxes is required by the rules and regulations of the department of agriculture of the state of Washington and the agricultural laws of this state; (h) hand-trucking the boxed fruit to a carrier for transportation to market, and loading upon said carrier for shipment to market, or hand-trucking the boxed fruit to cold storage to await shipment, and then from cold storage to said carrier and loading upon said carrier for transportation to market."

"10. All of such services have always been performed upon the orchard by the farmer and his employees until recently when the cost of the equipment became so large that farmers owning or operating small orchards could not afford the investment, and it became more economical to have the services performed at central locations. At the present time the identical services above set forth are performed upon the farm or orchard for the owner or tenant thereof by employees of the owner or tenant upon many orchards in the immediate vicinity of the plaintiffs."

"14. None of the plaintiffs, insofar as this action is concerned, conduct any of the operations in which such services are rendered upon a farm, but in packing houses and warehouses centrally located in Yakima, Selah, Buena, and Westbrook, in Yakima county, Washington. Some of the plaintiffs operate commercially solely, and grow no fruit of their own. Others of the plaintiffs grow fruit and also pack commercially for other farmers. Two of the plaintiffs, Cowiche Growers, Inc. and Yakima County Horticultural Union,

are cooperative associations, only handling the fruit of their members. The said cooperatives are duly organized under the laws of the state of Washington, and are classified as cooperatives by the state and federal governments under all laws with reference to cooperatives; and each of said cooperative associations is engaged in the business of marketing the fruit grown by its members and rendering such subsidiary and additional services as are necessarily incident thereto."

"15. That with the exception of fruit that is grown by some of the plaintiffs, and received, washed, sorted, sized, packed, and stored by them for their own account, each and all of the said services rendered by any of the plaintiffs are for the account of the farmer or grower of the fruit on a cost per box basis, and is charged directly to the grower."

"17. At the present time approximately one-third of all fresh fruits are ranch or orchard packed, one-third therof are packed by grower cooperatives, and one-third by centrally located packing plants on a custom basis by commercial packers for the grower. That is, that all Washington apples, pears, peaches, cherries, etc., are packed either by or for the grower."

The trial court, in its memorandum opinion, stated:

"Plaintiff contends that all of such services constitute agricultural labor within the meaning of that term as contained in chapter 162, Laws of 1937, and chapter 214, Laws of 1939.

"Defendant contends such services are not agricultural and that plaintiffs are liable for the contributions provided for by said acts, based upon employers wages for such services.

"By section 19 (g) (6), chapter 162, Laws of 1937, the legislature excluded from the operation of the act, 'Agricultural Labor'. The 1939 legislature amended section 19 (g) (6) i, so as to read as follows:

" 'The term employment shall not include (i) agricultural labor—(services customarily performed by a farm hand on a farm for the owner or tenant of a farm).'

"The legislature thus defined what it meant by agricultural labor in the enactment of 1937.

"The legislature of 1941 amended the act of 1939 and the definition of agricultural labor as contained therein so as to exclude from the operation of the act as agricultural labor the various services set forth in the complaint, which amendment more closely conforms to the definition of agricultural labor found in the act of congress.

"It is the contention of plaintiffs that this definition is interpretative and explanatory of the term agricultural labor used in the 1937 and 1939 acts. I do not think this contention can be successfully maintained. The 1941 act is purely an amendment. It does not purport to be retroactive and cannot be operative before the effective date fixed by statute after the passage of the act. . . .

"The rights of the parties to this action must be governed by the statute as it existed at the time of the performance of the work and I am satisfied that the work performed as set forth in the complaint cannot be considered as agricultural labor within the definition of the act of 1939. It is rather, employment in an industrial or commercial enterprise as contended by the defendant."

Judgment dismissing the action was entered on May 12, 1941, after demurrers to the complaint and amended complaint had been sustained, and after plaintiff had refused to further plead. This appeal by plaintiffs followed.

The assignments of error are (1) in sustaining the demurrer to the complaint; (2) in sustaining the demurrer to the amended complaint; (3) in entering judgment dismissing appellants' action. This opinion considers the allegations of both the complaint and amended complaint.

Appellants' argument is divided as follows:

"I. The services described in the complaint are 'agricultural labor' within the meaning of the 1937 act and within the meaning of the 1939 unnumbered section and within the meaning of the 1941 amendment to the unnumbered section.

"II. The 1941 act is a binding interpretation by the legislature as to what it intended to include within the term 'agricultural labor' in the 1937 act.

"III. Section 7 and section 19(g) of the 1937 act and any amendments thereto are to be construed against the state and in favor of the taxpayer.

"IV. The legislature, in adopting the 1939 Federal definition of agricultural labor by § 14 of the 1941 act, also adopted the construction of that act by the Fifth Circuit Court of Appeals in the case of United States v. Turner Turpentine Company (C. C. A. 5th) 111 F. (2d) 400.

"V. The two farmer cooperatives, Cowiche Growers, Inc., and Yakima County Horticultural Union, are not subject to the act for additional reasons.

"VI. The Washington unemployment compensation act, insofar as it could possibly apply to the services described in the complaint, became inoperative in August, 1939, upon the adoption by Congress of the 1939 amendment to the social security act."

Before proceeding to a discussion of the specific questions raised, we think it might be well to have in mind the purpose and policy of this act as expressed in § 2, chapter 162, Laws of 1937, p. 574 (Rem. Rev. Stat. (Sup.), § 9998-102 [P. C. § 6233-302]):

"Whereas, economic insecurity due to unemployment is a serious menace to the health, morals and welfare of the people of this state; involuntary unemployment is, therefore, a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and to lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. Social security requires protection against this greatest hazard of our economic life. This can be provided only by application of the insurance principle of sharing the risks, and by the systematic accumulation of funds during periods of employment to provide benefits for periods of unemployment, thus maintaining purchasing powers and limiting the serious social consequences of poor relief assistance. The State of Washington, therefore,

exercising herein its police and sovereign power endeavors by this act to remedy the widespread unemployment situation which now exists and to set up safeguards to prevent its recurrence in years to come. The legislature, therefore, declares that in its considered judgment the public good, and the general welfare of the citizens of this state require the enactment of this measure, under the police powers of the state, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons unemployed through no fault of their own, and that *this act shall be liberally construed for the purpose of reducing involuntary unemployment and the suffering caused thereby to the minimum.*" (Italics ours.)

The Connecticut supreme court, in the case of *Duys & Co. v. Tone,* 125 Conn. 300, 5 A. (2d) 23, in dealing with the consideration to be given to its unemployment compensation act, stated:

"In the case of a statute of wide application, as is an unemployment compensation act, in its adoption, interpretation, and administration, as well as in determining its validity, it is the general field of its operation and effect which is to be regarded rather than its application to individual exceptional cases, and appropriateness to the general situation is the predominant consideration. *Jeffrey Mfg. Co. v. Blagg,* 235 U. S. 571, 577, 35 Sup. Ct. 167 [59 L. Ed. 364]."

The foregoing statement is quoted with approval in the case of *Park Floral Co. v. Industrial Commission,* 104 Colo. 350, 91 P. (2d) 492.

Having in mind, then, that the purpose of this act is the reduction of involuntary unemployment, and that the act is to be liberally construed to effectuate that purpose, let us proceed to a discussion of the first question raised by appellants in their brief.

"Employment" is defined by § 19 (g) (1), chapter 162, Laws of 1937, p. 610 (Rem. Rev. Stat. (Sup.), § 9998-119 [P. C. § 6233-317] (g) (1)), as follows:

" 'Employment,' subject to the other provisions in this subsection, means service, including service in interstate commerce, performed for wages or under any contract of hire, written or oral, express or implied."

Section 19 (g) (6): "The term 'employment' shall not include: (i) Agricultural labor . . . "

The legislature of 1939, by § 16, chapter 214, p. 853, sought to amend certain portions of § 19, chapter 162, Laws of 1937. However, certain parts of § 16, chapter 214, including the section number, were vetoed by the governor. The term "employment," as defined in § 19 (g) (1), chapter 162, Laws of 1937, was not changed by the 1939 amendment, but § 19 (g) (6) was amended to read as follows:

" (6) The term 'employment' shall not include:

" (i) Agricultural labor; (services customarily performed by a farm hand on a farm for the owner or tenant of a farm)."

It is § 16 of chapter 214, Laws of 1939, that is referred to by appellants as the "unnumbered section," and which was amended by the 1941 act (chapter 253, Laws of 1941, p. 915, § 14), § 19 of chapter 162, Laws of 1937, having been expressly repealed by the 1941 act (p. 915, § 13). This unnumbered section of the 1939 act is carried as § 9998-119a in Rem. Rev. Stat. (Sup.).

The basis of appellants' argument, as set out in subdivision one, is that all of the services performed by the employees of appellants, as set out in the complaint and amended complaint, are inherently and mandatorily necessary before harvesting of the fruit is complete; that, until those services have been rendered, the fruit is not marketable, regardless of where the services are performed, and whether the employees rendering the services are hired by the farmer directly

or are hired by someone whom the farmer employs to perform the services. As stated by appellants,

"The crux of the question is whether or not the fact that these services are rendered off the farm by organizations performing the service for the farmer on a customs basis changes the services from agricultural labor to something else."

In support of their contention that the place where, or the one for whom, the work is performed should not change the nature of the services performed, appellants cite and rely to a considerable extent on the case of *Baldwin v. Roby,* 54 Wyo. 439, 93 P. (2d) 940, and cases there cited.

The cited case was before the court as the result of a claim filed by Leslie Roby under the workmen's compensation act of Wyoming, to recover for injuries sustained by him while working on a hay baler for one Owen Hallam. The latter was baling hay for various farmers on their farms, but the work was done on contract. Roby was injured while assisting in baling hay on the farm of a Mr. Bever. The state intervened in the proceeding, claiming that the workman was not protected under the workmen's compensation act of that state. Whether he was or was not so protected was the sole question presented. The opinion states:

"Section 124-105, R. S. 1931, excepts from the workmen's compensation act persons engaged in 'ranch, farm, agricultural or horticultural labor and stock raising.' Counsel for the employee claim that this provision is not in point; that in this case the employee was engaged in an industrial pursuit and not in agricultural labor, by reason of the fact that Hallam was not a farmer, but went from place to place in Park County, baling hay on contract, and that accordingly he was engaged in an industrial occupation."

The lower court allowed Roby the sum of eighteen hundred dollars under the act. In reversing the lower

court and holding that the services performed consti-
tuted farm labor under the act, the court quoted from
the Minnesota case of *State ex rel. Bykle v. District
Court,* 140 Minn. 398, 168 N. W. 130, as follows:

" 'The important question is, What is the nature of
the work? *The work is done upon a farm.* It is done
upon farm crops. The purpose of growing the crops
is to provide food for consumption or market. . . .
The fact that more complicated mechanical devices
are used . . . does not change the character of the
work. Much farm work is done by the use of compli-
cated machinery. There are tractor plows, self-binders
and even combination harvester threshers by means of
which harvesting and threshing are done as one opera-
tion. These and other operations may be done for
others by one who is able to own the more compli-
cated and expensive machinery. But it is all, never-
theless, farm work and the employe who does such
work is a "farm laborer" within the meaning of the
Compensation Act.' " (Italics ours.)

The court referred to a line of cases from which it
appears that the statute excepts from the operation
of the act farm or agricultural laborers, and in which
it was held that one employed by an operator of a
machine like a thresher or corn shredder for various
parties in the community, for hire under contract, is
not a farm or agricultural laborer, but is engaged
in an industrial pursuit. The court then went on to
say:

"The reasoning of the first line of authorities above
mentioned [being the case last above referred to]
is not applicable in the case at bar. One of the rea-
sons will be stated later. We must first call atten-
tion to the fact that our statute does not except from
the workmen's compensation act 'farm or agricultural
laborers,' but employees engaged in agricultural or
farm labor, a term somewhat broader than the former,
or at least clearer. The Idaho statute excepts from
the workmen's compensation act persons engaged in
'agricultural pursuit,' but the court, in the Idaho case

above cited [*Cook v. Massey,* 38 Idaho 264, 220 Pac. 1088], does not make the distinction just mentioned. In that case an employee of a commercial thresher was held to be engaged in an agricultural pursuit, and we think, notwithstanding the contention of counsel for Roby to the contrary, that 'agricultural labor' is equivalent to 'Agricultural pursuit.' We think that the distinction first above mentioned, namely between 'farm or agricultural laborers' and 'employees engaged in farm or agricultural labor' is not captious or too subtle."

The cited case also referred to the case of *Lowe v. Workmen's Compensation Bureau,* 66 N. D. 246, 264 N. W. 837, 107 A. L. R. 973, in the following language:

"In that state those employed in agriculture are excepted from the benefits of the workmen's compensation act, and it was held in the foregoing case that the employee of the owner of a threshing machine who was threshing grain under contract for others did not come within the Workmen's Compensation Act. The court said among other things: 'One may be employed in agriculture and yet not be a "farmer" in the ordinary sense of the term, nor even a "farm laborer" as the term is used in our lien laws. They are not synonymous terms. The term "agriculture" is broader than either of the others. The expression "employed in agriculture" refers to the type of work that is done rather than to the form of the contract for the work.' "

Appellants also quote from the Iowa case of *Sylcord v. Horn,* 179 Iowa 936, 162 N. W. 249, 7 A. L. R. 1285, and the Utah case of *Jones v. Industrial Commission of Utah,* 55 Utah 489, 187 Pac. 833, both of these cases being referred to, and quoted from, in the *Roby* case.

Appellants then argue that it is immaterial where the work is performed, citing *Davis v. Industrial Commission of Utah,* 59 Utah 607, 206 Pac. 267, wherein it was held that a sheep herder, herding sheep on the public domain, is an "agricultural laborer" under the

industrial act of Utah, and not entitled to compensation for injuries received while so herding, the same as though he had been herding on his employer's ranch at the time the injuries were received.

We think the case of *Industrial Commission v. United Fruit Growers Ass'n,* 106 Colo. 223, 103 P. (2d) 15, cited by appellants, decided in May, 1940, may be distinguished from the instant case, for the specific reason that in the cited case the commission, as it was authorized to do, had promulgated a regulation defining the term "agricultural labor," which regulation defined the term as it was defined by our legislature in 1941, to include services such as herein performed. We shall refer later to the 1941 amendment to our unemployment statute.

Appellants further contend that the phrase "agricultural labor" is broader and includes more than the phrase "farm labor," that is, all farm labor is also agricultural labor, but there are many activities which are not farm labor yet are agricultural labor, citing *Baldwin v. Roby, supra,* and other cases.

Appellants then contend that the term includes storage and marketing of crops, citing *Bucher v. American Fruit Growers Co.,* 107 Pa. Super. Ct. 399, 163 Atl. 33, wherein Bucher had been employed by the American Fruit Growers Company, to haul barreled apples in his truck from the farm of the fruit company to a shipping point, and it was while returning from hauling a load of apples that he was injured. It was contended that, at the time he was injured, Bucher was engaged in agriculture, and therefore did not come within the terms of the Pennsylvania workmen's compensation act, which excludes from its operation any person who, at the time of injury, is engaged in domestic service or agriculture. The opinion in the cited case concludes with these words:

"We are convinced that the defendant as a fruit grower was engaged in agriculture, and that the claimant [Bucher] in helping the defendant for compensation to harvest and deliver for shipment or storage the crop of apples obtained from the orchards of the defendant, was engaged in the pursuit of agriculture."

■ Appellants also contend, under this heading, that the services of appellants' employees have been considered as agricultural labor under numerous acts of this state, because under these acts the operations here in question are regulated by the department of agriculture of this state, arguing that it would be accusing the legislature of being hypocritical to say that the services performed in reference to sorting, working, packing, sizing, and grading of fruit were agriculture in reference to the regulations of the industry, but were not agricultural, but industrial or commercial, when referring to the unemployment tax statute. We are unable to agree with appellants, that the legislature, by placing the regulation of the fruit industry in this state under the department of agriculture, necessarily meant by so doing to class as "agricultural labor" such services as those performed by the employees of appellants herein, or attempted in any way to classify such services. It seems to us perfectly natural and logical that this regulation should be placed in this department.

We cannot refer to or discuss the many cases cited by appellants, but those we have referred to herein we think clearly indicate the reasons which form the basis of appellants' contention as to the meaning of the term "agricultural labor." With the possible exception of the case of *Industrial Commission v. United Fruit Growers Ass'n, supra,* it might be stated that the services performed in the respective cases were performed on the farm. We recognize, of course, that, in

most of the cases cited, the court stated that it made no difference whether the work was actually done for the farmer himself or for someone who had contracted with the farmer to do the work, but again we cannot but be impressed with the fact that the court was dealing with work done upon the farm. However, be that as it may, we do not accept as binding on us, or as controlling herein, the cases cited by appellants, but we think, in view of the declared purpose of our unemployment statute, that the definition of "agricultural labor," and the reason given to support it, found in the case of *North Whittier Heights Citrus Ass'n v. National Labor Relations Board* (1940), 109 F. (2d) 76, and other cases to which we shall refer, are controlling herein.

In the cited case, the citrus association was engaged in the business of receiving, handling, washing, grading, assembling, packing, and shipping the citrus fruit of its members and others for marketing. The proceeding was instituted by the Citrus Packing House Workers Union Local No. 21,091, charging North Whittier Heights Citrus Association with unfair practices, under the national labor relations act. After a hearing before the national labor relations board, the board ordered the association to desist from certain practices, and to do certain other things. The association petitioned the court to review the action of the board, and one of the questions raised by the association was that its employees in the packing house were not "agricultural laborers," as that term is defined in the Wagner act (29 U. S. C. A. § 151 *et seq.*). Section 2 of this act, after defining the term "employee," states:

" . . . but shall not include any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or spouse." 29 U. S. C. A., § 152.

In the cited case, the court, after reviewing the history of the production and marketing of citrus fruit in California, said:

"We shall proceed to consider whether or not those employed in petitioner's packing house are 'agricultural laborers' and as such exempt under the Act from the Board's jurisdiction.

"The pursuit of definitions of 'agricultural laborers' through the cases leads to confusion because generally the case definitions have grown out of special statutory phraseology or out of judicial effort to conform to legislative intent. While it is quite impossible to phrase an all inclusive yet accurate definition of the term 'agricultural laborer' as it is used in the Wagner Act, the intent of Congress is not at all obscure."

The opinion, after referring to §§ 1 and 2 of the act, continues:

"The purpose of the Act is clear and we find the Act specifically excepting three kinds of employees from its provisions. It would seem profitable to consider whether or not there is a 'common denominator' in these three exemptions. We think there is. Why is 'any individual employed by his parent or spouse' exempted? Because (not excluding other reasons) in this classification there never would be a great number suffering under the difficulty of negotiating with the actual employer and there would be no need for collective bargaining and conditions leading to strikes would not obtain. The same holds good as to 'domestic service', and the same holds good as to 'agricultural laborer' if the term be not enlarged beyond the usual idea that the term suggests. Enlarge the meaning of any of these terms beyond their common usage and confusion results. When every detail of farming from plowing to delivering the produce to the consumer was done by the farmer and his 'hired man', this common denominator was present. But when in the transition of citrus fruit growing from this independent action to the great industry of the present in which the fruit is passed from the individual grower through contract to a corporation for treatment in a

packing house owned and run by such corporation, to be delivered by this corporation to an allied corporation for transportation and market, we think the common denominator has ceased to exist. The fact that these corporations are allied through their membership of growers does not, in our opinion, affect the situation under consideration. See Pinnacle Packing Company et al. v. State Unemployment Commission, decided February 19, 1937, by the Circuit Court of Jackson County, Oregon. . . .

"Industrial activity commonly means the treatment or processing of raw products in factories. *When the product of the soil leaves the farmer, as such, and enters a factory for processing and marketing it has entered upon the status of 'industry.'* . . .

"Petitioner maintains that the nature of the work is the true test. Perhaps it would more nearly conform to the true test to say that the nature of the work modified by the custom of doing it determines whether the worker is or is not an agricultural laborer." (Italics ours.)

The following statement in the opinion applies especially to the two co-operatives involved in the instant case:

"Petitioner argues that if each member of the non-profit cooperative corporation that runs the packing house were to personally hire and direct those doing his own packing and sorting, the work would be agricultural and his employees would be agricultural laborers; that it follows, therefore, that in the case of the same members acting under a single organization to accomplish the same result there can be no change in the nature of the work nor in the status of the persons doing it. The conclusion does not follow. *The factual change in the manner of accomplishing the same work is exactly what does change the status of those doing it.* The premise laid down by petitioner in this phase of its argument is not, however, the exact situation facing us. The packing house activity is much more than the mere treatment of the fruit. When it reaches the packing house it is then in the practical control of a great selling organization which accounts

to the individual farmer under the terms of the statute law and its own by-laws." (Italics ours.)

The opinion then quotes from the Pinnacle Packing Co. case, *supra*:

" 'The fruit growers who are engaged in the care, cultivation, picking, and delivery of the products of the orchard to be processed, graded, packed and marketed are engaged in *agricultural labor* and are exempt from the provisions of the statute. As soon as the fruit is delivered by the growers to the plaintiff for processing, grading, packing, and marketing, then the exemption ceases. The plaintiffs engaged in processing, grading, and packing and marketing the fruits are engaged in industry and are, therefore, subject to the provisions of the act and are not exempt as being engaged in *agricultural labor.*' "

The opinion on this phase of the case, concludes with the words:

"We conclude that the workers in petitioner's packing house are not agricultural laborers and are therefore not exempt from the operation of the Act."

We are in accord with the reasoning of the cited case, and are of the opinion it forms a sufficient basis for our conclusion that the services performed by the employees of appellants in the instant case should not be classed as "agricultural labor," unless some reason is presented in the other contentions of appellants, to which we shall refer, which would compel a different conclusion.

In line with the reasoning advanced in the *Citrus Ass'n* case, *supra,* is the case of *Park Floral Co. v. Industrial Commission,* 104 Colo. 350, 91 P. (2d) 492, a case involving the unemployment act of Colorado. Section 19 (g) (4) of the Colorado act provides: "The term 'employment' shall not include . . . (D) Agricultural labor." The cited case refers to the case

of *Great Western Mushroom Co. v. Industrial Commission,* 103 Colo. 39, 82 P. (2d) 751, then continues:

"The place, the method and manner of production, as well as the labor practices employed, must be weighed. By the evolutionary processes attendant on our present-day business methods, many activities formerly embraced in farming operations or in intimate connection therewith have become specialized and removed from the farm, and when this is accomplished such work may properly be regarded as thereby becoming industrial in nature, rather than agricultural in the common conception of that term."

See, also, *Unemployment Compensation Division v. Valker's Greenhouses,* 70 N. D. 515, 296 N. W. 143; *Duys & Co. v. Tone,* 125 Conn. 300, 5 A. (2d) 23.

Appellants, under subdivision two of their argument, contend that the 1941 act (Laws of 1941, chapter 253, p. 870) is a binding interpretation by the legislature as to what was meant by the phrase "agricultural labor" in the 1937 act. In the 1941 act, at page 920, there is described in detail what services shall be considered as "agricultural labor." Subdivision (2) on page 920 describes services such as here involved. We agree with the rule contended for by appellants, that, where the legislature has placed its own construction upon a prior enactment, the courts are not at liberty to speculate upon legislative intent.

However, we cannot agree that the 1941 act indicates what the legislature meant by the term "agricultural labor" in either the 1937 or 1939 acts, nor do we believe the 1941 act is applicable here. We agree with the trial court that the 1941 act is purely an amendment of the 1939 act, and cannot be considered as interpretative or explanatory of either the 1937 or 1939 act. See *Unemployment Compensation Division v. Valker's Greenhouses,* 70 N. D. 515, 296 N. W. 143, at 146. We are rather of the opinion the 1941

amendment was enacted because of conditions called to the attention of the legislature, which it did not have in mind at the time the former acts were passed. We are of the further opinion that the 1941 act is not available to appellants, for the reason that it did not become effective until June 12, 1941. This act does not purport to be retroactive, and cannot therefore be operative before its effective date.

In *Earle v. Froedtert Grain & Malting Co.*, 197 Wash. 341, 85 P. (2d) 264, we stated:

"It is a fundamental rule of statutory construction that a statute is presumed to operate prospectively and ought not to be construed to operate retrospectively in the absence of language clearly indicating such a legislative intent."

We are further of the opinion that by Laws of 1939, chapter 214, p. 857, § 16 (g) (6) (i), the legislature, by stating "Agricultural labor; (services customarily performed by a farm hand on a farm for the owner or tenant of a farm)," indicated in no uncertain terms that the term "agricultural labor," as used in the 1939 act, includes only labor performed on a farm, by a farm hand, for the owner or tenant of the farm, and that this was an interpretation of the meaning of the term "agricultural labor," as used in the 1937 act.

In view of the conclusion reached by us relative to the meaning of "agricultural labor" in the 1939 act, we do not believe it was the intent of the legislature, by the 1941 act, to deprive those who would come within the provisions of the 1937 and 1939 acts of benefits created by virtue of those acts.

Appellants further contend that taxation statutes are to be strictly construed against the state, and liberally construed in favor of the taxpayer, and that exemptions from a general statute are to be strictly construed against the taxpayer, contending that § 19

(g) (6) (i) is not an exemption. We do not think there is any occasion to determine which of the two rules above mentioned applies, as in our opinion the legislature, by the 1939 act, placed its own interpretation upon the meaning of the term "agricultural labor."

What we have heretofore said answers the fourth contention of appellants, that the legislature, in adopting the 1941 statute, which is almost word for word identical with the 1939 amendment of the Federal social security act, adopted the interpretation placed upon that statute by the Federal courts.

█ The fifth contention of appellants, which applies only to the two co-operatives, Cowiche Growers, Inc., and Yakima County Horticultural Union, is based upon the same argument advanced in the case of *North Whittier Heights Citrus Ass'n v. National Labor Relations Board, supra,* and for the reasons given in that case, we think the contention of appellants herein cannot be sustained. In so holding we have not overlooked the case of *Yakima Fruit Growers Ass'n v. Henneford,* 182 Wash. 437, 47 P. (2d) 831, 100 A. L. R. 435. This action was brought by the Yakima Fruit Growers Association, to restrain the tax commission from enforcing chapter 191, Laws of 1933, p. 869. Subdivision (7) of § 1 of chapter 191 defines engaged in business as follows:

"The word 'business' shall include all activities engaged in with the object of gain, benefit or advantage either direct or indirect. . . ."

Section 3 of chapter 57, Laws of 1933, Ex. Ses., p. 159, amends § 4 of chapter 191, and provides:

"Section 4. The following persons shall be exempted from the provisions of this act: . . .

"(2) Persons engaging in the business of:

"(a) Growing or cultivating for sale, profit or use any agricultural or horticultural product or crop. . . ."

In the cited case we stated:

"Inquiry must then be directed as to whether the respondents are engaged in business for the purpose of gain, benefit or advantage. Obviously, there is no benefit or advantage accruing to any of them from their operations, either direct or indirect. If there is any gain accruing to any of them, it must be in the form of what might be called 'profit.' "

The opinion further states: "The corporation was not organized for profit, and makes none." In holding that the corporation and other plaintiffs came within the exception, and were not liable under the act, we further stated:

"We see no reason for holding that, because a large number of producers, most of whom are not what would be called large producers, cause a corporation to be organized for the purpose of assisting them in the production, packing, warehousing and sale, they should not be on the same basis as a producer individually, whether large or small, or two or more persons cooperating together by joint enterprise rather than by corporate entity. The fact that they operate through a corporate entity in which they own the stock and the corporation makes no profit and distributes the proceeds after a sale and the payment of the expenses of a pro rata per box basis, does not put them in a materially different situation than if two or more of them cooperated simply as members of a joint undertaking without corporate existence."

Appellants in their brief, in referring to the language above set out, say: "It would seem that this language was written specifically for the purpose of this lawsuit." We must admit that the language used in the cited case is in line with the argument of appellants. It would seem, however, that the real point under consideration was whether or not the plaintiffs, in-

cluding the co-operative, came within the definition of the word "business," as contained in the act, and having held that they were not engaged in business "with the object of gain, benefit, or advantage either direct or indirect," that it was unnecessary to go further.

It would also seem that to hold that a co-operative, in doing the things which it is authorized to do, comes within the exception of one engaged in the business of "growing or cultivating for sale, profit or use any agricultural or horticultural product or crop," is going to the extreme limit. We do not think the language above referred to should be extended to apply to co-operatives or their employees, performing such services as are here involved, when considering whether or not such services constitute "agricultural labor" under the unemployment act.

In this connection, we have examined, among others, the following cases cited in appellant's list of additional authorities: *Georgia Milk Producers Confederation v. Atlanta,* 185 Ga. 192, 194 S. E. 181; *Owensboro v. Dark Tobacco Growers' Ass'n,* 222 Ky. 164, 300 S. W. 350; *Sanitary Milk & Ice Cream Co. v. Hickman,* 119 W. Va. 351, 193 S. E. 553; and *Mountain States Beet Growers' Marketing Ass'n v. Monroe,* 84 Colo. 300, 269 Pac. 886. These cases were decided upon statutes different from those involved in the instant case, as for instance, the *Georgia Milk Producers* case, wherein it was held that the co-operative, which was organized for the purpose of marketing the dairy products of its members, was exempt from a municipal tax under a statute expressly providing that " 'no municipal corporation shall levy or assess a tax . . . on any *agricultural products* raised in this State, or the sales thereof . . . ' " (Italics ours.) In the *Sanitary Milk & Ice Cream Co.* case *supra,* the state sought to

impose a gross sales tax on the ice cream company. The act in question provided, in part, that the sales tax should be applicable to

" ' . . . every person engaging or continuing within this State in the business of selling any tangible property whatsoever, real or personal, . . . except sales by any person engaging or continuing in the business of horticulture, agriculture or grazing or of selling stocks, bonds or other evidences of indebtedness. . . . ' "

The act further provided that the tax should not be applicable to " 'societies, organizations and associations organized and operated for the exclusive benefit of their members and not for profit.' "

The act under which the co-operatives in the instant case were organized contains no such exemption, nor do the 1937 and 1939 acts here in question. We are therefore of the opinion the cited cases are not controlling herein.

■ Appellants' conclusion as stated in subdivision six of their argument hereinbefore referred to, is based upon the contention that, by § 22 of the unemployment compensation act (Laws of 1937, chapter 162, p. 615, § 22, Rem. Rev. Stat. (Sup.), § 9998-122 [P. C. § 6233-322]), the legislature provided that, if Congress should extend the coverage of the social security act of August 14, 1935, to other exempted services or employment, then the Washington act should automatically extend to the same services. Section 22, *supra,* provides:

"If the Congress of the United States, by amendatory legislation, extends the application of its Social Security Act of August 14, 1935, to include employers who are not now embraced under or covered by the said act of Congress, then and in that event, the provisions of this act shall be deemed amended to conform with the changes as enacted by Congress and approved by the President of the United States with respect to the scope and application of the said act of Congress of August

14, 1935, and, upon any such change being made, the governor, when advised of the approval thereof by the President, shall immediately by official proclamation declare the germane provision or provisions of this act amended in conformity with the change or changes as so made in the Social Security Act and such amendment or amendments shall be operative from the date of the governor's proclamation.

"In the event that this section should be declared unconstitutional or invalid by a court of last resort, such adjudication shall not in any wise impair, affect or invalidate any other section, part or provision of this act, and the remainder of the act shall be given the same effect as if this section had never been enacted."

While we seriously doubt the constitutionality of § 22, for the reason that it is apparently an attempt to delegate legislative authority, by virtue of which funds appropriated under our unemployment compensation act might be expended under the terms and conditions of an act of Congress to be passed in the future (see 11 Am. Jur. 930, § 219), we do not deem it necessary at this time to pass upon this constitutional question, for the reason that it must be conceded that the 1939 amendment to the Federal social security act did not extend the act to cover employees not theretofore embraced within or covered by the act, but rather the 1939 amendment, as is evident by our 1941 act, which contains almost the exact words of the 1939 amendment to the Federal social security act, narrows the coverage. This may be a somewhat technical distinction, but we think it is the plain meaning of this section.

Appellants further argue that the legislature, by § 22 having made our act agreeable with the Federal act, then proceeded in § 23 (Laws of 1937, chapter 162, p. 616, § 23, Rem. Rev. Stat. (Sup.), § 9998-123 [P. C. § 6233-323]) to make the act agreeable to any limita-

tion or further exemption from the operation of the Federal act. We think appellants have misconstrued the plain meaning of § 23. This section reads:

"If the tax imposed by Title IX of the Federal Social Security Act or any amendments thereto, or any other Federal tax against which contributions under this act may be credited shall, for any cause become inoperative, with the result that no portion of the contributions required under this act may be credited against such Federal tax, then this act by virtue of that fact, shall be suspended until the legislature shall meet and take action relative thereto, and any unobligated funds in the unemployment compensation fund, and returned by the United States Treasurer because such Federal Social Security Act is inoperative, shall be held in custody by the state treasurer and under supervision of the commission until the legislature shall provide for the disposition thereof."

We think it was the intent of the legislature, as expressed in this section, to suspend the operation of the unemployment act until the next session of the legislature, in the event title IX of the Federal social security act became inoperative; in other words, in the event no funds were available under the Federal act to match those of the state.

In conclusion, may we say that, having in mind at all times the stated purpose of the act here in question, and after a consideration of many cases wherein the term "agricultural labor" or terms which are much like it have been considered, and having in mind the apparent meaning to be given to the term "agricultural labor" as found in the 1939 act, we are firmly of the opinion it was not the intent of the legislature to include in the term "agricultural labor," as used in either the 1937 or the 1939 act, services such as were performed by the employees of appellants in this case, but rather that such services should be considered as employment in industry. It follows, therefore, that

the employees of appellants are not excluded from the operation of our unemployment act, and that appellants are liable for the contributions provided for, both under the 1937 act and the 1939 amendments thereto.

The judgment of the trial court is affirmed.

MAIN, BEALS, STEINERT, BLAKE, and DRIVER, JJ., concur.

SIMPSON, J. (dissenting)—I concur in the statement made by the majority that the unemployment compensation act should be liberally construed in order to accomplish the purpose mentioned in § 2, chapter 162, Laws of 1937, p. 574 (Rem. Rev. Stat., § 9998-102). However, I am unable to agree that the legislature intended to bring appellants, and those in like positions, within the provisions of the act. A liberal interpretation may properly be invoked to aid the apparent purposes of a statute. It may not be used to evade its plain intent or to deny its clear mandate. *Keeney v. Beasman*, 169 Md. 582, 182 Atl. 566, 103 A. L. R. 1515.

The problem confronting us may be stated very simply. Do the employees of appellants, who are engaged in packing and warehousing fruit, come within the exception mentioned in the unemployment compensation act when the services designated as agricultural labor are performed off the farm?

This action was decided on demurrer. Consequently, respondents have admitted as true paragraph eight of appellants' complaint that the services performed by appellants' employees are services customarily performed by a farm hand on a farm. The allegations from paragraph eight read:

"The employees rendering these services are known principally as: receivers of fruit, hand truckers, dumpers, washing machine operators, sorters, packers, packing room flunkies, lidders, labelers, checkers, stampers, car loaders and stackers. *Each and all of such services*

*is mandatorily and necessarily performed in order that the fruits can be marketed; and the services herein-above mentioned rendered by the employees of the plaintiffs are the same identical services necessarily performed by employees of farmers on fruit orchards for the farmers and growers of the fruit whenever the farmer has a large enough fruit orchard, in order to be able to wash, sort, and pack his own fruit. The said services are exactly the same, regardless of where the services are performed.* The said services are essential and necessary incidents to the preparation of the fruit for market, without which such fruit cannot be marketed in the channels of trade." (Italics mine.)

Our unemployment compensation statute passed in 1937, chapter 162, p. 574 (Rem. Rev. Stat. (Sup.), § 9998-101 [P. C. § 6233-301] *et seq.*) in so far as it is material to the discussion of this case, provides:

Section 7 (a), p. 587:

"Payment.—

"(1) On and after January 1, 1937, contributions shall accrue and become payable by each employer for each calendar year in which he is subject to this act, with respect to wages payable for employment (as defined in section 19 (g)) . . ."

Section 8 (c) (2), p. 591, provides in part:

"Any employing unit for which services that do not constitute employment as defined in this act. . . ."

Section 19, p. 609:

"As used in this act, unless the context clearly requires otherwise: . . .

"(d) 'Contributions' means the money payments to the state unemployment compensation fund required by this act. . . .

"(g) (1) 'Employment,' subject to the other provisions in this subsection, means service, including service in interstate commerce, performed for wages or under any contract of hire, written or oral, express or implied. . . .

"(g) (6) The term 'employment' shall not include:

"(i) Agricultural labor; . . .

"(m) 'Wages' means remuneration payable by employers for employment. . . ."

Chapter 214 of the Laws of 1939, p. 818, changed the original act in the following particulars:

Section 5, p. 830, amending § 7 of the 1937 act:

"Section 7. (a) Payment.

"(1) On and after January 1, 1937, contributions shall accrue and become payable by each employer for each calendar year in which he is subject to this act, with respect to wages payable for employment (as defined in section 19 (g)) . . .

"(b) Rate of Contribution. Each employer shall pay contributions equal to the following percentages of wages payable by him with respect to employment: . . ."

Section 16, p. 853, amending § 19 of chapter 162 of the Laws of 1937:

"As used in this act, unless the context clearly requires otherwise: . . .

"(d) 'Contributions' means the money payments to the state unemployment compensation fund required by this act. . . .

"(g) (1) 'Employment,' subject to the other provisions in this sub-section, means service, including service in interstate commerce, performed for wages or under any contract of hire, written or oral, express or implied. . . .

"(6) The term 'employment' shall not include:

"(i) Agricultural labor; (services customarily performed by a farm hand on a farm for the owner or tenant of a farm). . . .

"(m) 'Wages' means the first three thousand dollars of remuneration payable by one employer to an individual worker for employment. . . ."

It was the evident intent of the legislature to relieve those engaged in agricultural pursuits from paying the taxes provided by the act. Our state and Federal governments for many years have followed a studied plan of exempting farmers from the provisions of many

laws which apply to other occupations. It was in furtherance of this plan that our legislature exempted agricultural labor from the provisions of the unemployment compensation act.

Turning now to the main question: If the services necessary for the preparation of fruit for market are agricultural labor when performed on a farm for the farmer, are those identical services still agricultural labor when accomplished for that same farmer in a warehouse by an independent contractor? To prove that the answer is in the affirmative and that the legislature did not intend to create the distinction between washing an apple *on a farm* for a farmer and washing an apple *in a packing house* for a farmer, my discussion will be divided into two parts: (1) an examination of the term "agriculture," and (2) an examination of the exception "agricultural labor" and its legislative definition.

To show that the proposition established by the demurrer is true as a general rule of law, a search of the authorities reveals that the term "agriculture" has acquired not only a comprehensive meaning, but also a certain definite classification. Accordingly, the authorities indicate that while all farming is agriculture, not all agriculture is farming.

2 Am. Jur. 395, § 2, says:

"Agriculture, in the broad and commonly accepted sense, may be defined as the science or art of cultivating the soil and its fruits, especially in large areas or fields, and the rearing, feeding, and management of livestock thereon, *including every process and step necessary and incident to the completion of products therefrom for consumption or market* and the incidental turning of them to account. *The term is broader in meaning than 'farming;'* and while it includes the preparation of soil, the planting of seeds, the raising and harvesting of crops, and all their incidents, it also includes gardening, horticulture, viticulture, dairying,

poultry, and bee raising, and more recently, 'ranching.' " (Italics mine.)

An elaborate definition is also found in *Keeney v. Beasman*, 169 Md. 582, 586, 182 Atl. 566, 568, 103 A. L. R. 1515:

"Literally, *agri cultura* means the tillage or cultivation of the soil. But, like many words compounded of different elements, it has a meaning of its own broader than that of its elements considered separately, for from time immemorial it has been regarded as synonymous with husbandry, and includes, not only the cultivation of the soil and the raising of crops, but also 'gathering in the crops and raising live stock' (Oxford Dictionary), and, as a natural concomitant of those activities, *marketing the products of the soil,* the increase and the products yielded by the stock, such as wool and milk. That has been so from the earliest times." (Italics mine.)

Again, in *Robinson v. Lytle*, 276 Ky. 397, 400, 124 S. W. (2d) 78, 80, the court collected several definitions:

"Since 'agricultural pursuit' has been held to 'include every process and step taken and necessary to the completion of a finished farm product' (*Cook v. Massey*, 38 Idaho 264, 220 P. 1088, 1091, 35 A. L. R. 200), and ' "agriculture" covers all things ordinarily done by the farmer and his servants incidental to the carrying on of his branch of industry' (*Warner v. Longstreth*, 108 Pa. Super. 124, 164 A. 806), and ' "Agricultural laborers" [is] a term broader and more comprehensive than "farm laborers"';' (*Davis v. Industrial Commission of Utah*, 59 Utah 607, 206 P. 267, 269), it can be readily seen that the boundary extends further in some cases than in others, and that "agriculture" is the broadest exclusion. In *Keefover v. Vasey*, 112 Neb. 424, 199 N. W. 799, 35 A. L. R. 191, the court said [page 801]:

" '*There is some discussion . . . upon a supposed distinction between one engaged in agricultural pursuits and one engaged in farm labor. Such a distinction doubtless exists in the sense that one who is engaged in the pursuit of agriculture may not neces-*

*sarily be a farm laborer, but it is quite evident that every farm laborer is engaged in an agricultural pursuit. . . .'"* (Italics mine.)

Finally, in *United States v. Turner Turpentine Co.,* 111 F. (2d) 400, 404, the court, in discussing the term "agricultural labor" under the social security act, the prototype of ours, remarked:

"When then, Congress in passing an act like the Social Security Act, uses, in laying down a broad general policy of exclusion, a term of as general import as 'agricultural labor', it must be considered that it used the term in a sense and intended it to have a meaning wide enough and broad enough to cover and embrace agricultural labor of any and every kind, as that term is understood in the various sections of the United States where the act operates. This does not mean of course, that a mere local custom which is in the face of the meaning of a general term used in an act, may be read into the act to vary its terms. It does mean, however, that when a word or term intended to have general application in an activity as broad as agriculture, has a wide meaning, it must be interpreted broadly enough to embrace in it all the kinds and forms of agriculture practiced where it operates, that its generality reasonably extends to."

From the foregoing authorities, therefore, it may be stated that the word "agriculture" is very broad in scope, that "farming" is a species of the general term "agriculture," and that the preparation of fruit on a farm for market is agricultural labor.

Supposing fruit preparation work is done in a packing house, as in the instant case, would this transfer in work-place correspondingly change the label "agricultural labor" to something else? The majority bases its decision upon the wording of § 19 (g) (6), which states that "services customarily performed by a farm hand on a farm for the owner or tenant of a farm" shall not be termed employment. In stating its conclusion, the majority says:

"We are further of the opinion that by Laws of 1939, chapter 214, p. 857, § 16 (g) (6) (i), the legislature, by stating 'Agricultural labor; (services customarily performed by a farm hand on a farm for the owner or tenant of a farm),' indicated in no uncertain terms that the term 'agricultural labor,' as used in the 1939 act, *includes only labor performed on a farm,* by a farm hand, for the owner or tenant of the farm, and that this was an interpretation of the meaning of the term 'agricultural labor,' as used in the 1937 act." (Italics mine.)

Clearly, the statement in the act refers to the kind or character of the work performed and not to the place of its performance.

The important question is, What is the character or nature of the work? I interpret the language in the statute as words describing "services customarily performed." Hence, instead of the act referring to the place of performance, it merely describes the type of service—the nature of the work—coming within the term "agricultural labor." The prepositional phrase "on a farm" adds merely to the general description of the nature of the services. The legislature did not intend that the statute should define agricultural labor in a limited or confined sense, especially when it employed the comprehensive term "agricultural," and used the indefinite article "a" rather than the definite article "the."

" 'The' is the word used before nouns, with a specifying or particularizing effect, opposed to the indefinite or generalizing force of 'a' or 'an'. *United States v. Hudson,* 65 F. 68, 71." 1 Words and Phrases (Perm. Ed.), 1.

Thus, the language should not be interpreted either to confine the performance to a specific area or to a certain person. On the contrary, it should be interpreted as creating a general test and standard, a standard which describes the various services accord-

ing to the nature of the work. Read from this perspective, the interpretation will then coincide with the comprehensive term it explains.

Perhaps my conception of the erroneous holding by the majority may appear more obvious by aid of the following illustration. Under the involved section, three factual situations, on the whole, are possible. First, a farmer may employ A, B, and C to prepare his fruit for market; the work is done on the farm. To the majority, this is the only case where workers are exempt. Second, the farmer may engage an independent contractor to prepare the fruit. The contractor, depending on the circumstances, may perform the work on the farm or at his establishment. For this situation, let us assume that the contractor and his employees, A, B, and C render the services on the farm. That A, B, and C are then agricultural laborers is established by the following authorities: *Lowe v. Workmen's Compensation Bureau*, 66 N. D. 246, 264 N. W. 837, 107 A. L. R. 973; *Jones v. Industrial Commission of Utah*, 55 Utah 489, 187 Pac. 833; *Baldwin v. Roby*, 54 Wyo. 439, 93 P. (2d) 940. In the third situation, the farmer contracts with the contractor for the preparation of the fruit. But since the contractor can do the work more economically and more conveniently at his establishment, the fruit is taken there.

That the legislature intended to discriminate between situation (1) and situation (3), or even between situation (2) and situation (3), seems impossible, especially on a basis such as place of performance. I can discern no reason, therefore, for holding that, because a number of fruit farmers cause a co-operative to be organized to facilitate marketing, they should be subject to the terms of a statute which concededly would not apply to the labor employed by them acting individually, or by other persons employed in the same

activity, who are not members of such an organization.

Recalling the question in the case at bar again, where services (preparation of fruit for market) rendered to a farmer on his farm (situations (1) and (2)) are classed agricultural labor, does the fact that these same services (preparation of fruit for market) are performed off the farm (situation (3)) change this label of the labor from agricultural to something else? The answer is, the services remain exactly the same.

Unfortunately, there is not only a dearth of cases presenting factual situations similar to the one at bar, but also a decided conflict in these. I believe, however, that the reasoning expressed in *Bucher v. American Fruit Growers* Co., 107 Pa. Super. Ct. 399, 168 Atl. 33, is much sounder than that of *North Whittier Heights Citrus Ass'n v. National Labor Relations Board,* 109 F. (2d) 76, the majority's principal case, which was based to a certain extent upon an Oregon unreported circuit court case. In the *Bucher* case, claimant prosecuted an appeal under the workmen's compensation act. The company, owner of a number of farms set out in apple orchards, employed claimant to haul barreled apples in his truck. Claimant loaded barreled apples upon his truck at the company's packing shed, hauled them to the railway station, aided in placing them in railway cars, and occasionally assisted in "running apples" into barrels. While returning from a haul, claimant had a collision, sustaining injuries. Subsequently, he filed his compensation application. The act exempted persons who, at the time of the injury, were engaged in agricultural services.

In upholding the employer's defense that claimant was engaged in agriculture and therefore excluded from the act, the court said:

"We think the legislature used the words 'agricultural workers' and the phrase 'engaged in agriculture'

in their comprehensive, usual and commonly accepted sense; there is nothing in the act or in its title indicative of an intention to distinguish grain growers and their employes from fruit or vegetable growers and their employed laborers. The following excerpts from the opinion in the court below are adopted: 'The question raised is whether or not the word "agriculture" legally construed would include fruit growing,— the care, maintenance and cultivation of orchards and the harvesting, storage and shipping of the fruit raised therein. Agriculture as defined by Webster is the "art or science of cultivating the ground, especially in fields or in large quantities, including the preparation of the soil, planting of seeds, the raising and harvesting of crops and the rearing, feeding and management of livestock." In Funk & Wagnall's dictionary agriculture is defined as "a science that treats of the cultivation of the soil," and under this definition it is stated "agriculture as a generic term includes at once the science or art and process of supplying human wants by raising products of the soil and by associated industries.

" 'It is contended by the claimant that fruit growing is horticulture, an occupation distinct from agriculture and not included therein. But the dictionary definition of horticulture is "the department of the science of agriculture which relates to the cultivation of gardens or orchards, including the care of vegetables, fruit, flowers, and ornamental shrubs and trees." In common parlance it is unquestioned that agriculture would be considered as including fruit growing. If it is correct that horticulture is one department of agriculture, then agriculture must include horticulture. [See also 2 Corpus Juris, 988,] The occupations of growing fruit and of raising other crops are so allied to each other and the character and condition of labor required so identical in each case that we can see every reason why a laborer in fruit growing should be treated and classified in the same way under this Act of Assembly as a laborer on a farm which grew crops other than fruit. Of course the storage and marketing of the crop raised whether it be fruit or grain, is just as much the work of agriculture as is the planting and

cultivation thereof, or any other labor engaged in for the purpose of furthering, as a main or an incidental purpose, the cultivation of the ground or raising of crops. We are convinced that the defendant as a fruit grower was engaged in agriculture, and that the claimant in helping the defendant for compensation to harvest and deliver for shipment or storage the crop of apples obtained from the orchards of the defendant, was engaged in the pursuit of agriculture.' "

Again, in *Big Wood Canal Co. v. Unemployment Compensation Division,* 61 Idaho 247, 100 P. (2d) 49, the canal company, a mutual nonprofit corporation engaged in operating an irrigation system serving some nine hundred farmers, claimed a refund from the unemployment compensation division because the service performed by its employees was "agricultural labor" as defined by the act. In allowing the refund to the employer canal company, the court made this observation:

"The fact, that the reservoirs or impounding works are many miles distant from the farms to which the water belongs and is delivered through intervening canals, renders the labor necessary for its storage and delivery no less 'agricultural labor.' The farmer who goes to the warehouse 20 miles away for a load of fertilizer, or a load of seed, does not by those acts lose his character or designation as a farmer or one engaged in 'agricultural labor.' The fact, that the Big Wood Canal Co. employs and pays the men who tend and maintain the reservoirs and canals, and measure and deliver the water to the farmers, renders them no less laborers in the interest and field of agriculture, since the entire maintenance and operating expense is charged up to and prorated among the various farms and tracts of land to which the water is delivered as an appurtenance. [Citing cases] The Big Wood Canal Co. *is not a profit-making* corporation; it is merely a medium or instrumentality created to represent the farmers owning water rights from the reservoirs and is doing for them what each one cannot do alone for himself."

That the test in these cases is not place of performance, but the character and nature of the performance, is clearly illustrated by *Davis v. Industrial Commission of Utah*, 59 Utah 607, 206 Pac. 267. Claimant was engaged by a farmer to herd sheep on the public domain. His claim for injuries was denied on the ground that the Utah industrial act excepted agricultural labor. In upholding denial of compensation, the court stated:

"The applicant for compensation herded sheep for his employer on the public domain. If he was an agricultural laborer when herding on the owner's ranch, the fact that the sheep were herded elsewhere would not remove him from this class of labor. If raising stock on a small farm is agriculture, raising stock on a large ranch is the same; and if raising and caring for sheep on the owner's premises is agriculture, the laborer's avocation is not changed by the sheep being pastured and herded elsewhere, whether on the public domain or not."

With regard to the majority's cases of *Park Floral Co. v. Industrial Commission*, 104 Colo. 350, 91 P. (2d) 492, and *Great Western Mushroom Co. v. Industrial Commission*, 103 Colo. 39, 82 P. (2d) 751, the court in *Industrial Commission v. United Fruit Growers Ass'n*, 106 Colo. 223, 103 P. (2d) 15, had this to say:

"It is certain that the products involved herein are purely agricultural in character and were produced under ordinary field operations on fruit farms and orchards. Thus the decisions in *Great Western Mushroom Co. v. Industrial Commission*, 103 Colo. 39, 82 P. (2d) 751, and *Park Floral Co. v. Industrial Commission*, 104 Colo. 350, 91 P. (2d) 492, wherein the products involved were 'specially cultivated under artificial structures or diggings,' and not 'produced under ordinary field operations,' are in no manner applicable in the case at bar."

Because I feel that the legislature intended that the true test was the nature of the services performed

rather than the place where they were performed, and because I believe that appellants' employees come within the exemption of "agricultural labor," I dissent.

ROBINSON, C. J., concurs with SIMPSON, J.

[1]Reported in 117 P. (2d) 644.