## No. 14,455.

### PARK FLORAL COMPANY *v.* INDUSTRIAL COMMISSION.
(91 P. [2d] 492)

Decided May 15, 1939. Rehearing denied June 12, 1939.

Messrs. DAVIS & WALLBANK, Mr. TERRELL C. DRINK-WATER, for plaintiff in error.

Mr. BYRON G. ROGERS, Attorney General, Mr. WALTER F. SCHERER, Assistant, for defendant in error.

Messrs. DAVIES, RICHBERG, BEEBE, BUSICK & RICHARD-SON, Mr. RAYMOND C. CUSHWA, amici curiae on petition for rehearing.

*En Banc.*

MR. JUSTICE KNOUS delivered the opinion of the court.

THIS action was instituted by the Industrial Commission of Colorado under the Colorado Unemployment Act, chapter 167a, 1937 Supp., '35 C. S. A., chapter 2, S. L. Third Extraordinary Session, 1936, to recover unemployment compensation contributions from the Park Floral Company upon the basis of the wages paid by that company to its employees during the months of September, October, November and December, 1937. Reference will be made to the parties respectively as the commission

and company. Judgment below was for the commission and the company brings the adjudication here for review.

Section 19(4) of the act, as far as applicable here, provides: "The term 'employment' shall not include (D) agricultural labor." Defendant contends that the labor of its employees comes within this exemption, and that as a consequence thereof no contributions under the act are required to be made by it as their employer. The company is engaged exclusively in the floral business and in this connection owns and operates large greenhouses covered with glass in the customary manner and in which the temperature and humidity are controlled artificially. The company grows its flowers and plants almost exclusively in the greenhouses, although a small portion of the flowers and plants during the summer months are cultivated and grown in tracts in the open air adjacent to and outside of greenhouses. The greater part of the flowers and plants grown by the company is sold on the wholesale flower and plant market by wholesale salesmen for later resale by retail florists in Colorado, principally in Denver, and in various other parts of the United States. A relatively small proportion of its products are sold at retail by the company in its retail store located in downtown Denver. The plants and flowers sold by the company at retail and wholesale are expertly and adequately packed for delivery and shipment. During the months involved in this proceeding the company had fifty-three employees, thirty of whom, said to be unskilled laborers, were engaged exclusively in and around the greenhouses in the planting, cultivating, spraying, preparing cuttings or slips, transplanting, cutting of flowers and plants, and in packaging, potting, and preparing cut flowers, plants and floral pieces for transportation to the wholesale and retail florist trade. One employee was engaged in regulating the control of the temperature in the different greenhouses; two were engaged in firing boilers and duties attendant thereto; one employee was engaged exclusively in carpenter work in and about the greenhouses; four

employees operated trucks in the delivery of products of the company to the wholesale and retail florist trade in and near Denver; two acted as traveling salesmen with operations within and without the state of Colorado; one other salesman sold the products of the company to the retail florist establishments located within the city of Denver; three others acted as salesmen in the retail store of the company in connection with which they prepared and packed cut flowers for delivery to retail customers; five employees were engaged in clerical and bookkeeping work; one other was a telephone switchboard operator in the retail store of the company; another was engaged as porter, janitor and watchman therein, and two employees were engaged in executive capacities, one supervising the retail store and retail sales of the company, the other the greenhouse operations and the wholesale department.

Witnesses for the company testified that it has a twenty-five per cent seasonable turnover largely in the unskilled class but conceded that in the greenhouse operations flowers are picked nearly every day of the year.

Purportedly acting within the scope of the rule-making authority conferred by section 11 (a) of the act, the commission promulgated and adopted what is designated as Regulation No. 6, defining the term "agricultural labor" as used in the act, as including all services performed: "(A) By an employee, on a farm, in connection with the cultivation of the soil, the harvesting of crops, or the raising, feeding, or management of livestock, bees and poultry; or (B) By an employee in connection with the processing of articles from materials which were produced on a farm; also the packing, packaging, transportation, or marketing of these materials or articles. Such services do not constitute 'agricultural labor,' however, unless they are performed by an employee of the owner or tenant of the farm on which the materials in their raw or natural state were produced, and unless such processing, packing, packaging, transportation, or marketing is carried on as an

incident to ordinary farming operations as distinguished from manufacturing or commercial operations, or unless the products grown were produced under ordinary field operations as distinguished from products specially cultivated under artificial structures or diggings. As used herein the term 'farm' embraces the farm in the ordinarily accepted sense, and includes stock, dairy, poultry, fruit and truck farms, plantations, ranches, ranges and orchards.''

The commission in demanding contributions from the company under the act and in the subsequent litigation, proceeded upon the theory that the definition of ''agricultural labor'' contained in the foregoing regulation, was controlling. The company, however, vigorously asserts that this promulgation constitutes an arbitrary attempt by the commission to restrict and limit the ordinary meaning of the term ''agricultural labor'' as used in the act and, in effect, amounts to illegal administrative legislation. This objection is foreclosed by a recent pronouncement of this court in *Great Western Mushroom Co. v. Industrial Commission,* 103 Colo. 39, 82 P. (2d) 751, where, in referring to Regulation No. 6, Chief Justice Hilliard, in delivering the opinion of the court, said: ''We cannot think the promulgated regulation is other than in keeping with the clear intent of the enactment.'' In that case it was determined that the growing of mushrooms in confined areas, under cover, did not come within the classification of ''agriculture'', so as to exempt persons engaged in such business and their employees from the operation of the provision of the Colorado Unemployment Compensation Act here involved. The Supreme Court of Connecticut in the case of *Duys & Co. v. Tone,* 5 A. (2d) 23, in a well considered opinion, wherein the Great Western Mushroom case, supra, was cited and from which extracts are quoted, in considering the Connecticut regulation, No. 3, promulgated by the administrator of the Connecticut Unemployment Compensation Act, under section 811d (a) thereof,

which rule is in the precise words of Regulation No. 6, supra, except for that portion of the latter following the words "commercial operations" in paragraph "b" thereof, said:

"In the case of a statute of wide application, as in an unemployment compensation act, in its adoption, interpretation, and administration, as well as in determining its validity, it is the general field of its operation and effect which is to be regarded rather than its application to individual exceptional cases, and appropriateness to the general situation is the predominant consideration. Jeffrey Mfg. Co. v. Blagg, 235 U. S. 571, 577, 35 Sup. Ct. 167, 59 L. Ed. 364. In the present instance it cannot be justly said that the dividing line drawn by the regulation determinative of whether or not specified services constitute agricultural labor is illogical in conception or arbitrary or unjust in its general application; that it may be claimed to be not entirely appropriate to an isolated and in some respects unique situation such as that presented here is no adequate ground for condemning a rule which in its general practical operation is not shown to be unreasonable or unjust. The conclusion [of the trial court] that the regulation is invalid as not within the purview of the act itself was erroneous.   *   *   *

"A further claim is that the making of the regulation involves an invalid delegation of legislative authority to an administrative officer. The Legislature, having by its enactments declared policies and fixed primary standards, may validly confer on administrative officers power to 'fill up the details' by prescribing rules and regulations to promote the spirit and purpose of the legislation and its complete operation. United States v. Shreveport Grain & Elevator Co., 287 U. S. 77, 85, 53 Sup. Ct. 42, 77 L. Ed. 175; United States v. Grimaud, 220 U. S. 506, 31 Sup. Ct. 480, 55 L. Ed. 563; note, 79 L. Ed. 489; State ex rel. Young v. Duval County, 76

Fla. 180, 79 So. 692; 11 Am. Jur. 926, 956. The instant regulation does not subvert the statute; it does not decide what is and what is not to be deemed an infringement of a law (State v. Kievman, 116 Conn. 458, 470, 165 Atl. 601); it is within the permissible delegatory powers of the Legislature.''

██ The company also seeks to avoid the effect of the conclusion in the Great Western Mushroom Company case, by attempting to distinguish between that and the present case upon a factual basis. In this connection it is asserted that there is a spread of four subkingdoms of the vegetable kingdom between that which contains the mushroom and that including green plant materials, and that, whereas, the former is grown commercially in darkness, the latter group requires light. We think this technical distinction immaterial since it is a matter of common knowledge that mushrooms as well as flowers and floral plants are products of the earth, and in their natural state, before perfected by man, flourished naturally in the open field. It must not be overlooked that the Unemployment Insurance Act looks to the achievement of social security for labor and not to the classification of fruits of the soil. While unquestionably it is true that the production of an agricultural crop involves as an essential factor ''agricultural labor'' as exempted by the act, it is equally certain, as pointed out in Great Western Mushroom Company case and in *Duys & Co. v. Tone, supra,* that such labor is but one of several elements to be considered. The place, the method and manner of production, as well as the labor practices employed must be weighed. By the evolutionary processes attendant on our present-day business methods, many activities formerly embraced in farming operations or in intimate connection therewith, have become specialized and removed from the farm, and when this is accomplished such work may properly be regarded as thereby becoming industrial in

nature, rather than agricultural in the common conception of that term. *Keeney v. Beasman,* 169 Md. 582, 182 Atl. 566 (dairy products); New International Encyclopedia, 250.

██ The company next stresses its seasonal labor turnover, saying that this differentiates between the mushroom and the floral business and demonstrates the analogy between the latter and ordinary farm operations. This fluctuation in employment, to which reference is made as ''seasonable'', however, is only secondarily dependent upon the natural seasons of the year which inexorably control plant life in the open field, but is primarily regulated by the company in accordance with the market demand for its products, savoring of an industrial, rather than a farm, process; also, unlike the orthodox farm crops, its products are gathered nearly every day in the year. In the light of these considerations we think the labor situation disclosed by the record here is generally not dissimilar to that shown in the Great Western Mushroom Company case, nor does the stability of employment in the executive, sales and technical departments of the company, composing nearly one-half of its employees, approximate the plight of ordinary farm labor, neither does it have the transitory characteristics of the latter. The maintenance of a clerical and bookkeeping staff by the company, which doubtless keeps accurate records of its labor operations, negatives the likelihood of administrative difficulties in ascertaining and collecting contributions, which has been said to be one of the factors motivating and justifying the exemption of certain types of labor, including agricultural under unemployment insurance acts similar to ours. *Carmichael v. Southern Coal Co.,* 301 U. S. 495, 57 Sup. Ct. 868, 81 L. Ed. 1245; *Duys & Co. v. Tone, supra.* Under the evidence it would seem certain that regarding the definition contained in Regulation No. 6, supra, as well as the spirit of the act, the trial court was correct

in determining that the employees of the company are not engaged in "agricultural labor." The greenhouses and retail stores of the company certainly cannot be said to be "farms in the ordinarily accepted sense," and workers engaged in this branch of the company's business obviously do not perform services "on a farm"; nor under subdivision B of the regulation can employees engaged in packing, packaging, transporting and marketing the products of the company be classed as "agricultural labor," since their activities are not "incidental to ordinary farming operations," and the flowers and plants involved are not "produced under ordinary field operations as distinguished from products specially cultivated under artificial structures."

The company further contends that inasmuch as the federal government and a number of states, by administrative rule have exempted the operations of greenhouses from similar acts, that such administrative rulings must be persuasive in determining the meaning of "agricultural labor" in this jurisdiction. There can be no doubt that the Colorado act is closely related to Title IX of the unemployment insurance portion of the Federal Social Security Act, 42 U. S. C. A. §1101, and is somewhat similar to most of the acts of this character found in other states. It also is unquestionably true that some administrative agencies under these acts have held that employees of greenhouses are engaged in "agricultural labor". These rulings, however, are not controlling upon the courts. *Industrial Commission v. Northwestern Mutual Life Ins. Co.*, 103 Colo. 550, 88 P. (2d) 560. On the subject of the effect of federal regulations on questions arising under local statutes, the Supreme Court of Kansas, in *Capitol B. & L. Ass'n v. Kansas Commission*, 148 Kan. 446, 83 P. (2d) 106, 108, recently said: "It may readily be admitted that the federal revenue department is staffed with competent lawyers, and that the department's opinions are entitled to respect and consideration; but those opinions are ex parte opinions and do not

have the convincing weight of adjudications arrived at in sharply contested judicial proceedings.''

The judgment is affirmed.

MR. JUSTICE FRANCIS E. BOUCK not participating.