# CACHE VALLEY TURKEY GROWERS ASS'N v. INDUSTRIAL COMMISSION

No. 6628. Decided December 30, 1943. (144 P. 2d 537.)

See 61 C. J. Taxation, sec. 433. What constitutes "agricultural labor" or "farm labor" within social security or unemployment compensation acts, note, 139 A. L. R. 1164. See, also, 48 Am. Jur. 534.

*Young & Bullen*, of Logan, for plaintiff.

*Grover A. Giles*, Atty. Gen., *Zar E. Hayes*, Asst. Atty. Gen., and *F. F. Dremann*, of Salt Lake City, for defendant.

LARSON, Justice.

Certiorari to review an order of the Utah Industrial Commission fixing contributions to be paid by plaintiff under the Unemployment Compensation Act of Utah on wages paid to plaintiff's employees.

There is no dispute as to the facts. Plaintiff was organized in 1942 as a non-profit mutual corporation, for the purpose of processing and preparing for market the turkeys of the association. It is conceded that there is no market for the turkeys until they have been processed, and that processing of large flocks on farms of the individuals is not practicable unless the farmer has the equipment necessary to do the job in the same way as it is done by the processing plants, because large numbers of birds must be moved in a day or two because of market demands; and that such equipment is too expensive for each farmer to purchase.

Plaintiff's plant was completed in 1942, and processed birds that year. At the conclusion of the operation of the plant for the year, the Industrial Commission fixed contributions to be paid by plaintiff to the unemployment compensation fund, based on wages paid by plaintiff during the operating period. The writ of certiorari is to review such order.

Plaintiff takes the position that it is exempt from the provisions of the act because its employees perform "agricultural labor" as defined in subsection (j) 8 of 42-2a-19, U. C. A. 1943. Defendant contends for a restricted interpretation of this clause and argues that, because the work is not done on a farm, because it is done in a plant having the physical properties similar to commercial plants in the vicinity doing the same business, and because the labor is hired, this processing does not constitute something done "as an incident to ordinary farming operations," and therefore is an employment within the terms of the act.

Subsection (j) (6) of 42-2a-19, U. C. A. 1943, provides:

"The term 'employment' shall not include: * * * (D) Agricultural labor (as defined in paragraph (8) of this subsection)."

Subsection (8) of the section provides:

" 'Agricultural labor.' The term 'agricultural labor' includes all services performed— * * *

"(D) In handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market or to a carrier for transportation to market, any agricultural or horticultual commodity; *but only if such service is performed as an incident to ordinary farming operations* or, in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market. The provisions of this paragraph shall not be deemed to be applicable with respect to service performed in connection with commercial canning or commercial freezing or in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption." (Italics added.)

It is upon the italicized portion of the statute that defendant places much reliance to maintain its position, arguing

that such a plant operated by the plaintiff is commercial in nature, and could not be "an incident to ordinary farming operations."

We should keep in mind the procedure in interpreting the statute as laid down in *Singer Sewing Machine Co.* v. *Industrial Comm.* (On petition for rehearing), 104 Utah 196, 141 P. 2d 694. It was there said that once it has been determined that a service relationship exists as that term is defined by the act, the filtering out clauses of the act should be consulted to determine whether that service relationship is filtered or culled out of those within the act. We start, then, in this case with the service relationship, for it is not denied that plaintiff's employees are in such relationship, as defined by the act. We look to the provisions of subsection (8) (D) to determine the meaning of "agricultural labor" which the act declares shall not constitute "employment" as that term is used therein. This is a filtering out section to exclude what has already been recognized as a service relationship, from the operation of the act.

This section has never before been directly interpreted by the court, but in *Roberts* v. *Industrial Comm.*, 97 Utah 434, 93 P. 2d 494, 496, a somewhat similar case was brought before the court. One Elder was employed as a sheep shearer. Plaintiff was the owner of the shearing equipment; shearing being done for any sheep men who desired to use the facilities. The principal issue there involved was whether Elder was an employee of plaintiff or of the sheep men. The court held that there was no evidence to sustain a finding that Elder was employed by plaintiff. After so deciding, the court said:

"The Legislature has said that 'agricultural labor' is exempt. Section 19 (j) (6) (4). Is this not a definition of the 'kind' of work done, and not 'for whom it is done'? For a similar principle see: Jones v. Industrial Comm., 55 Utah 489, 187 P. 833."

In the *Jones* case, supra, a number of farmers had gone together and bought a threshing machine, operating it on a share basis, and threshing the grain of others as well as

that of the part owners of the machine, though it appeared that the machine was purchased primarily for their own use. At the time of the accident, no threshing had yet been done that season, but during the year threshing was done for the public generally. When the accident occurred, preparations were being made to thresh the grain of a nonowner of the machine. The court held there that claimant at the time of his injury was engaged in agricultural labor, and therefore exempt from the provisions of the Workmens' Compensation Act. The statute there interpreted is 42-1-41, U. C. A. 1943 (provisions interpreted identical in Sec. 3111, C. L. 1917), which merely stated that "agricultural labor" is exempt from the provisions of the act, without any definition of the term. *Davis* v. *Industrial Comm.*, 59 Utah 607, 206 P. 267, 269, also under the Workmen's Compensation Act, is another case which supports the idea that the term "agricultural labor" defines the kind of work done, and not for whom it is done, or where it is done. The court there said:

"The applicant for compensation herded sheep for his employer on the public domain. If he was an agricultural laborer when herding on the owner's ranch, the fact that the sheep were herded elsewhere would not remove him from this class of labor. If raising stock on a small farm is agriculture, raising stock on a large ranch is the same; and if raising and caring for sheep on the owner's premises is agriculture, the laborer's avocation is not changed by the sheep being pastured and herded elsewhere, whether on the public domain or not."

A similar case is *Keefover* v. *Vasey*, 112 Neb. 424, 199 N. W. 799, 802, 35 A. L. R. 191, where a number of farmers purchased threshing equipment together. As in the *Jones* case, supra, it was held that employees of the owners of the machinery were agricultural laborers, in spite of the fact that some contract threshing was done for nonowners. The court said:

"To hold that defendants were not employers of farm laborers while threshing the grain of Bradley, but would be such when threshing the grain of Vasey, or some other part owner of the machine, would tax our powers of distinction to the point of confusion."

See, also, In re *Roby*, 54 Wyo. 439, 93 P. 2d 940. Considering these authorities together, it becomes apparent that it does not matter where or for whom the work is done, it is the kind of work that is the controlling principle; and to meet the requirements of the statute in this instance it must be "incident to ordinary farming operations." Keeping this in mind, it will be seen that defendant's argument that the employees are taken out of the class of agricultural laborers because the work is not done on a farm or for a farmer, but is done for a corporation in the plant of that corporation, is without merit. Especially is this so as defendant admits that had this same work been done on a farm for a farmer, the employees would have been exempt from the provisions of the act.

In *Batt* v. *Unemployment Comp. Div. of Ind. Acc. Bd.*, Idaho, 123 P. 2d 1004, 1005, 139 A. L. R. 1157, it was held that employees hired by an individual to process fruit and vegetables, that is, wash, sort and pack them preparatory to marketing, were agricultural laborers, in spite of the fact that the greater portion of the products processed were purchased from the individual farmers and not produced by the processor. The court said:

"It is clear that the appellant does, for hire, just such work as the farmer would have to do himself or hire someone else to do, on the farm or elsewhere, in preparation of his products for market. For this labor, the appellant received and deducted from the sale price 'the expenses including a charge for processing and a brokerage charge,' and paid the balance to the farmer. * * *

"I fail to see wherein the work done upon consigned products is any less 'agricultural labor' than that done upon the same kind of products purchased by appellant, or grown by him on his own farm. It was all *agricultural labor*." (Italics in original.)

In *Yakima Fruit Growers' Ass'n* v. *Henneford*, 182 Wash. 437, 47 P. 2d 831, 833, 100 A. L. R. 435, the court said:

"The evidence in this case shows that there are in the Yakima valley a number of large producers who individually do all of these things [process fruit for sale] for themselves, and they, of course, would not be under the act. We see no reason for holding that, because a

large number of producers, most of whom are not what would be called large producers, cause a corporation to be organized for the purpose of assisting them in the production, packing, warehousing, and sale, they should not be on the same basis as a producer individually, whether large or small, or two or more persons co-operating together by joint enterprise rather than by corporate entity. The fact that they operate through a corporate entity in which they own the stock and the corporation makes no profit and distributes the proceeds after a sale and the payment of the expenses on a pro rata per box basis does not put them in a materially different situation than if two or more of them co-operated simply as members of a joint undertaking without corporate existence."

This was in the case of a co-operative much like the one here involved, for the purpose of washing, packing and marketing fruit, and the court held that its employees were not within the provisions of the Compensation Act, which excluded agricultural laborers. And in *Industrial Comm.* v. *United Fruit Growers Ass'n,* 106 Colo. 223, 103 P. 2d 15, 17, a case of a marketing co-operative, the court said:

"The basic conception of an agricultural cooperative association is that of a group of farmers who reside in the same vicinity acting together for their mutual benefit in the cultivating, harvesting and marketing of their agricultural products, and the association itself, with the special powers and limitations conferred by statute, is merely a convenient instrumentality in the hands of the farmers for carrying on such activities. * * * Accordingly, because of the peculiar relationship between the cooperative association and its members, it would seem evident that such of the purely agricultural activities of the producer members as are incidental to his ordinary farming operations remain so whether they are performed by him on his farm or for him through the medium of his cooperative marketing association."

With the logic of the foregoing, we are in complete accord. Here is a case where, as in *American Sumatra Tobacco Corporation* v. *Tone,* 127 Conn. 132, 15 A. 2d 80, there is no market for the product of the soil until it has been processed. The processing can, and in the past has been done by the individual farmer, but the cost of buying and maintaining equipment to do the work, where there are many birds to handle in a short time, is too great for the individual to bear. When it is done on the individual farms, by the men

who raise the turkeys and their hired help, it is admittedly an agricultural occupation, and exempt from the provisions of the act. How then is the situation changed by a number of farmers banding together and forming a nonprofit organization to do that work? The same individuals pay for the work, and control it, the only difference being that they appoint a corporate agent to supervise it for them.

Nor can it be said that the processing as here done would constitute "manufacturing" as contended by defendant. In *United States* v. *Turner Turpentine Co.*, 5 Cir., 111 F. 2d 400, the court held that employees of a turpentine company were agricultural laborers. In that instance the turpentine was partially refined by the use of stills before it was marketed. We can see no essential difference between taking out some of the moisture from the raw turpentine, and removing of the feathers from the turkeys.

Let us now turn to a history and analysis of the statute. The Utah statute, as far as the scope or definition of "employment" within the act is concerned, was an exact copy of the Federal Act. As enacted in 1936, Sp. Sess. c. 1, Laws 1936, and amended in 1937, Laws 1937, c. 43, it excepted from the provisions of the act, "agricultural labor." Under this provision considerable difficulty was experienced by the Federal agencies in administration of the act, and the courts were not agreed as to what the term included. Thus the Washington court in *Cowiche Growers, Inc.*, v. *Bates*, 10 Wash. 2d 585, 117 P. 2d 624, 628, held, pursuant to a regulation of the unemployment commissioner, that the work must be done "on a farm" to constitute agricultural labor. And in *Great Western Mushroom* v. *Industrial Comm.*, 103 Colo. 39, 82 P. 2d 751, the court held that growing mushrooms was not agricultural labor, because the commission had enacted a regulation or definition of "agricultural labor" limiting it to work performed by an employee of the owner of a farm or a tenant of the farm on which the articles were grown. The same court for the same reason held that

the growing of flowers by a floral company was not "agricultural labor." *Park Floral Co.* v. *Industrial Comm.,* 104 Colo. 350, 91 P. 2d 492. In Connecticut the court upheld a board regulation declaring that the term "agricultural labor" did not include work which had formerly been done on a farm, but which had now become somewhat specialized and was not done on the farm. *H. Duys & Co.* v. *Tone,* 125 Conn. 300, 5 A. 2d 23. And different tests were applied by different courts and commissions to determine if a certain type of labor was agricultural. Some states applied the test of location of the work; some the element of profit; some the nature of the product. *Yakima Fruit Growers' Ass'n* v. *Henneford,* supra; *Peterson* v. *State Industrial Acc. Comm.,* 140 Or. 326, 12 P. 2d 564. General confusion and administrative difficulties were the results. Because of such considerations the Congress passed an amendment to the Federal Act in 1939, 42 U. S. C. A. § 409 (*l*), to define "agricultural labor" and clarify the scope of the exemption. In 1941 our own legislature amended the Utah act, Laws 1941, c. 40, which had theretofore exempted "agricultural labor" to define that term in the exact language of the Federal amendment. We have quoted the present Utah act supra. That amendment sought to clarify the meaning of the term "agricultural labor" by dividing it into four classes or groups and indicating the measuring rod or test to be applied in each group or class:

A. Services performed *on a farm* in connection with raising or harvesting any agricultural or horticultural commodity.

B. Services performed *partly on a farm and partly off* if performed in the employ of a farm operator in connection with the operation of a farm although not in raising or harvesting agricultural or horticultural commodities.

C. Sevices performed *off a farm* in connection with the production or harvesting of any commodity defined as an agricultural commodity in Sec. 15(g) of the Federal Agricultural Marketing Act, 12 U. S. C. A. § 1141j(g) ; or in

connection with raising mushrooms, hatching poultry, ginning cotton, or in operating or maintaining irrigation works.

D. Services performed *off a farm* in "handling * * * processing, freezing, grading, storing, or delivering * * * any agricultural * * * commodity * * * if such service is performed as an incident to ordinary farming operations * * *."

We recognize that in subsections C and D the act does not specify whether "on" or "off a farm" but the language clearly imports "off a farm." This must follow from the following reasons: The express provision that A must be "on a farm"—and B must be part on the farm, while nothing is said about the location of C and D. Again subsection C expressly covers chicken hatcheries, maintenance and operation of irrigation systems and reservoirs, etc., used exclusively for agricultural purposes, which in the very nature of things would not be done on the separate farms, and mostly not on any farm. So too the types of labor set forth in subsection D are such that they cannot in reason be required to be done on each farm where the farmer must process for market his whole crop in a few days. The commission answers that what has been said would make a satisfactory and complete case for the farmers, except for the clause in D "if such service is performed as an incident to ordinary farming," under which clause it contends the operations here performed were "commercial" and not incident to ordinary farming.

If the killing, dressing, cooling and grading of the farmers' turkeys done at the co-operative plant is an "incident to ordinary farming operations" it is concededly agricultural labor. This phrase is not itself as clear as might be desired, but we are not wholly without aid as to its meaning. The The federal amending act was passed pursuant to a report of a congressional committee defining it. The meaning and definition of the phrase "as an incident to ordinary farming operations" is given in Senate and House Committee Reports 76th Congress 1st Session, House Report No. 728, p. 53,

Senate Report No. 734, p. 63. We quote from the latter report:

"The expression 'as an incident to ordinary farming operations' is, in general, intended to cover *all services of the character described* in the paragraph which are ordinarily performed by the employees of a farmer *or by the employees of a farmers' cooperative organization or group* as a prerequisite to the marketing, *in its unmanufactured state,* of any agricultural or horticultural commodity produced by such farmer or by the members of such organization or group. The expression also includes the delivery of such commodity to the place where, in the ordinary and natural course of the particular kind of farming operations involved, the commodity accumulates in storage for distribution into the usual channels of commerce and consumption. To the extent that such farmers, organizations, or groups, engage in the handling, etc., of commodities other than those of their own production or that of their members, such handling, etc., is not regarded as being carried on 'as an incident to ordinary farming operations.' In such a case the rules set forth in subsection (c) of this section apply.

*"In the case of fruits and vegetables,* however, whether or not of a perishable nature, *services performed* in the handling, drying, packing, etc., of those commodities constitute 'agricultural labor' *even though not performed as an incident to ordinary farming operations,* provided they are rendered as an incident to the preparation of such fruits or vegetables for market. Under this portion of the paragraph, for example, services performed in the sorting, grading, or storing of fruits or in the cleaning of beans, as an incident to their preparation for market will be excepted irrespective of whether performed in the employee of a farmer, a farmers' cooperative, or a commercial handler of such commodities.

"Since the services referred to in this paragraph must be rendered in the actual handling, drying, etc., of the commodity, the paragraph does not exempt services performed by stenographers, bookkeepers, clerks, and other office employees in the employ of farmers, farmers' cooperative organizations or groups, or commercial handlers. To the extent that services of this character are performed in the employ of the owner or tenant of a farm, however, and are rendered in major part on a farm, they may be exempt under the provisions of paragraph (2)." (Italics added.)

The federal act thus using the expression as so defined in the committee report which introduced and sponsored the amendment passed August 10, 1939, and became effective January 1, 1940. At the first legislative session there-

after, the Utah act was amended to adopt the language of the amended federal act, March 24, 1941, effective July 1, 1941. It seems clear the legislative intent in amending the act to define "agricultural labor" in the language of the amended federal definition was to make the Utah act conform and adopt the definition and meaning of the language employed as stated by the congressional committee, which originated and formulated the definitions.

In its brief, the commission does not dispute the statement of facts as made by the plaintiff, but devotes some space to argument of the question of who has the burden of proof in this case, and also the scope of review in appeals by certiorari from a decision of the commission. As we see it, these propositions have no bearing on the decision of this case. The sole question, which we have decided, is the meaning of the statute, Sec. 19(j) (6), and this is purely a question of law. Therefore we do not discuss the other matters raised by defendant.

For the foregoing reasons, the order of the Industrial Commission is annulled, and the case remanded.

McDONOUGH and WADE, JJ., concur.

WOLFE, Chief Justice (concurring specially).

This is a border line case. The test is whether the processing done by this co-operative is a "service * * * performed as an incident to *ordinary* farming operations." The word "ordinary" is quite important. The fact too that the processing was necessary to market the product is likewise a telling factor; also the fact that the work was done for the farmer co-operators. The co-operators retained title to the birds. They were not sold to the processor. Had the situation been as in *Batt* v. *Unemployment Comp. Div. of Ind. Acc. Bd.,* Idaho, 123 P. 2d 1004, 139 A. L. R. 1157, I should have more doubt. All of the above factors serve to prevent farmers from extending their operations beyond farming and into the field of manufacturing while still attempting to come in under the guise of farm operations. The

place where the operations are performed and whether done co-operatively through the legal instrumentality of a non-corporate association or a nonprofit corporation have some weight in determining whether the processes are incidental to ordinary farming operations but are not controlling in view of weightier considerations pointing the other way. I have some doubt in this case as to whether the processing carried on by the plaintiff was incidental to *ordinary* farming operations or whether it did not introduce processes which went beyond that but I resolve that doubt in favor of the plaintiff because of the fact that it appears that such processing was necessary to market the turkeys and was performed for the farmers.

The quotation from the Senate and House Reports which attempts to give some definite content to phrase "as incident to ordinary farming operations" is enlightening, especially where it states that such expression was "intended to cover all services * * * which are ordinarily performed by the employees of a farmer or by the employees of a farmer's co-operative organization or group *as a prerequisite to the marketing, in its unmanufactured state* of any agricultural or horticultural commodity produced by such farmer or by the members of such organization or group." (Italics added.) The processing of the turkeys done by the plaintiff organization appears to concern itself with operations prerequisite to marketing since the turkeys cannot be marketed in bulk without such processing. I confess that I am somewhat perturbed by the statement in the congressional report reading: "To the extent that farmers, organizations, or groups, engage in the handling, etc., of commodities other than those of their own production or that of their members, such handling, etc., is not regarded as being carried on 'as incident to ordinary farm operations.'" I am concerned because it appears that in the instant case this co-operative does handle some birds which were not raised or were not the property of the farmers who owned the co-operative, although such growers

must have made application for membership in the co-operative. In the construction which we place on the words "incident to ordinary farming operations" as pertaining to service performed by co-operatives off the farm we imply that the legislature intended to enunciate the policy of exempting "co-operatives" doing such services whilst not exempting commercial organizations performing the same service. While willing to go along with that as the pronouncement of this court I must call attention to the fact that in enunciating such policy the Legislature permitted such co-operatives to gain a distinct advantage over their commercial competitors. If "co-operatives" may process the turkeys of persons who are not co-operators I fear that the line of demarcation is destroyed and we may open the way to encouraging commercial or profit making concerns to avoid the tax on payrolls by the device of making all who bring birds to its establishment co-operators or applicants for membership in the venture or by some less obvious device. Certainly the doing of things co-operatively when it decreases the cost per unit is commendable but in our economy where free enterprise is also not to be discouraged it would seem that the co-operatives should be required to pay their way and bear their share of the social responsibilities which are loaded on to business such as disability and unemployment compensation. However, this I concede to be a matter for the legislature but I am not too sure that if a co-operative takes outside business charging a fee that it should not be permitted to claim exemption.

MOFFAT, Justice (concurring).

I concur in the opinion of Mr. Justice LARSON. There is a ray of hope offered to those lost in the filtering process. It is stated, "the filtering out clauses of the act should be consulted to determine whether *that service relationship* is filtered or culled out of those within the act." (Italics added.) It is a consummation devoutly to be wished, that the "filtering out clauses" may result in a product clear and

understandable or the meshes of the "filtering out clauses" become so fine that nothing in a service relationship may get through. In either event, employer, employe and unemployed will be nearing the promised land.