## PRODUCERS' CROP IMPROVEMENT ASS'N v. DALLMAN.

### No. 9810.

United States Court of Appeals
Seventh Circuit.

Nov. 23, 1949.

Clarence C. Chapelle, Chicago, Ill., for appellant.

Theron L. Caudle, Asst. Atty. Gen., Ellis N. Slack, Robert N. Anderson and Maurice P. Wolk, Sp. Assts. to Atty. Gen., U. S. Department of Justice, Washington, D. C., Howard L. Doyle, U. S. Atty., Springfield, Ill., and Marks Alexander, Asst. U. S. Atty., Springfield, Ill., for appellee.

Before MAJOR, Chief Judge, and KERNER and LINDLEY, Circuit Judges.

MAJOR, Chief Judge.

This suit was instituted by the plaintiff to recover taxes paid the defendant in 1946 under the Federal Insurance Contributions Act, 26 U.S.C.A. § 1400 et seq., and under the Federal Unemployment Tax Act, 26 U.S.C.A. § 1600 et seq., for the years 1941 to 1943, inclusive. The District Court after a trial without a jury made findings of fact, entered its conclusions of law and a judgment denying recovery. From this judgment plaintiff appeals.

The sole question involved is whether plaintiff's employees were engaged in "agricultural labor," which is similarly defined in each of said Acts. If plaintiff's employees were so engaged, then the tax under each Act was illegally assessed and collected and plaintiff is entitled to recover. If they were not so engaged, as the lower court found, the judgment denying recovery is proper and must be affirmed.

Sec. 1426(h), as amended by the Social Security Act enactments of 1939, defines "agricultural labor" under four categories. Par. (h) (4) is the one about which the instant controversy revolves. So far as here material, it provides:

"The term 'agricultural labor' includes all services performed—* * *

"(4) In handling, planting, drying, packing, packaging, processing, freezing, grading, storing, or delivering to storage or to market * * * any agricultural or horticultural commodity; but only if such service is performed as an incident to ordinary farming operations or, in the case of fruits and vegetables, as an incident to the preparation of such fruits or vegetables for market. The provisions of this paragraph shall not be deemed to be applicable with respect to service performed * * * in connection with any agricultural or horticultural commodity after its delivery to a terminal market for distribution for consumption."

Thus, it will be observed that the enumerated services are exempt from taxation if "performed as an incident to ordinary farming operations", unless such services are performed after the "delivery [of an agricultural commodity] to a terminal market for distribution for consumption."

There is no serious dispute as to the evidentiary facts either as found by the District Court or as testified to by the witnesses. Plaintiff is an agricultural cooperative association organized and existing under the laws of the State of Illinois, Ill.Rev. Stats.1947, Ch. 32, §§ 440–473. It has a membership of approximately 12,000 farmers. The sole purpose of its existence is to produce an adequate annual supply of high quality hybrid corn seed for its members, to be used by them in the production of the next ensuing commercial corn crop. The production of hybrid seed corn requires years of supervised effort, which begins with the initial planting of several strains of corn, technically called "inbreds," whose desirable characteristics are ultimately combined in the hybrid seed, and which ends with the labeling and storing of the packaged hybrid seed at plaintiff's plant. Inbreds and single crosses, the foundation stocks of hybrid seed corn, are grown by plaintiff with its own forces and equipment upon widely dispersed and isolated tracts of land, especially selected and rented for that purpose. This developing process requires from seven to ten years. The sole utility of hybrid corn is for seed to be used by the farmer who produces the commercial crop. Plaintiff had nothing to do with the latter. Hybrid seed corn must be purchased each year by the farmer engaged in producing the commercial crop.

To secure an adequate annual supply of hybrid corn seed for its member growers of commercial corn, plaintiff each year enters into contracts with selected farmers to grow corn which subsequently becomes the hybrid seed required for the next commercial crop. As the court found, "To that end, the plaintiff contracted each year with a small number of farmers who agreed to grow corn seed under the conditions and for the compensation provided by written contracts between each of them and plaintiff."

After the corn was grown and harvested, it was received in the form of ear corn at plaintiff's plant at Piper City, Illinois, where it was sorted, shelled, dried, graded, tested, treated with a fungicide, packaged and labeled. Without this service, the corn would have been worthless for the purpose for which it was intended, that is, as hybrid seed to be used in the production of a commercial crop. No question is raised but that the services rendered on the farm in the production of the ear corn were agricultural labor; in fact, the court found that such services were performed as an incident to ordinary farming operations. The services rendered by employees of the plaintiff at its plant, necessary to the completion of the process of producing hybrid corn for its members, are those in dispute and which the court concluded were not agricultural labor within the terms of the statute. This determination was predicated upon the finding that "The plaintiff was the terminal market for the seed corn delivered to its plant" and that "The processing operations in issue were performed after delivery of the seed corn to a terminal market for distribution for consumption." Thus, under these findings, the services in dispute are removed from what otherwise would constitute agricultural labor as defined in Par. (h) (4) above quoted.

The court in its conclusions of law stated in almost identical language as it had in its findings of fact that the plaintiff was a terminal market for the corn delivered to its plant, and that plaintiff's processing operations were performed after such delivery to a terminal market for distribution and consumption.

In Burger et ux. v. Social Security Board, D.C., 66 F.Supp. 619, 622, the court expressed the view that whether the work of the employer constituted "agricultural labor" within the meaning of the Act was one of law, and upon review, the Court of Appeals treated it in the same manner. Miller v. Burger et ux., 9 Cir., 161 F.2d 992, 993. Inasmuch as the evidentiary facts are not in dispute and the question presented

requires an interpretation of the statute, we are inclined to the same view. But we do not regard it as of great importance whether the question be considered one of law or of fact. In either event, we find ourselves confronted with a difficult and troublesome problem.

In support of the court's finding upon which its conclusion was predicated, the defendant argues, "As used in the foregoing statutes, a terminal market is the grower's market, the place where or point of time at which the grower of the crop parts with economic interest in and control over its future form or destiny." The rule of Burger, supra, appears to support this rule of statutory interpretation. The question here presented, however, is whether the facts of the instant case are such as to make the rule applicable.

In the Burger case, the Rosenberg Company bought, sold and processed dried fruit. It was the largest packer and distributor of dried fruit in the world and claimed to handle one-third of all dried fruit business in the United States. The workman involved was employed at the Fresno plant and was one of from 1,500 to 2,000 persons there employed in grading, processing, packing and shipping dried fruit. The company owned no land, leased no land and had no contracts with the growers of the fruit. In other words, the farmer-growers were entirely independent of the Rosenberg Company and could sell to it or not as they saw fit. So far as can be ascertained from a reading of the opinion, the farmers who raised the fruit, when they sold and delivered it to Rosenberg, were completely divested of all ownership or interest therein in the same manner as a farmer who grows wheat or corn when he delivers and sells it to the local elevator. It was upon these facts that the court held that Rosenberg was a commercial purchaser and that "terminal market" meant the grower's market. And it was in this situation that the court stated, 161 F.2d 992, 994: "We agree with that court that under the admitted facts in this case, Rosenberg Bros. plant was a 'terminal market' for the farmer producers who sold and delivered their dried fruit to that concern; that it was 'the market' of such farmer producers or to state it in another way, 'the growers' market' since this commercial plant was the place where the farmer producer of dried fruit customarily parted with all of his economic interest in the fruit, its future form or destiny. The facts make abundantly clear that it was only after the farmer producer sold and delivered the fruit to Rosenberg Bros. that Burger's services (described in the opinion of the district court) were performed for that commercial concern."

Notwithstanding defendant's assertion that the facts of the instant case are so similar to those of the Burger case as to call for the application of the rule there announced, we think there is a wide variance in the facts of the two cases, and it seems pertinent to relate them in some detail. The court found: "Under the contracts entered into with the growers, plaintiff agreed to furnish at its own expense the foundation stock from which the seed was to be grown, the plates for planting the foundation seed, and the equipment and supervisory personnel necessary for thinning, detasseling and harvesting the seed corn. In turn, the grower agreed to use the foundation seed furnished by plaintiff, and to prepare, plant and cultivate the fields in a manner satisfactory to the plaintiff. Between December 1st and April 28th, following the growing season, the grower agreed to offer to plaintiff for sale all seed corn grown by him and the plaintiff agreed to purchase all seed corn so offered and found by it to be acceptable. Provisions for determination of the sum to be paid the grower and for settlement were incorporated into the contract. It was further provided that in the event the plaintiff did not purchase the seed corn offered by the grower, the grower was free to use the seed corn as he saw fit, except that he could not sell or distribute it as seed. The sum to be paid the grower was in addition to the services hereinbefore referred to."

The facts thus found may properly be enlarged upon by further reference to some of the undisputed evidence.

Plaintiff entered into such contracts during different years with from 20 to 30 farmers. One of such contracts for each of the

years in question appears in the record. They are all in the same form, and we shall refer to the 1942 contract, which is entitled "1942 Production Agreement." The farmer is referred to as "the grower." As a preamble thereto it is stated:

"Whereas, the association desires to have certain lands planted for the growing of hybrid seed corn for the association, and

"Whereas, the grower has the possession of a type of land where hybrid seed corn can be grown for the association, and

"Whereas, the grower desires to plant and cultivate said land for the growing of hybrid seed corn for the association * * *."

That the corn was produced for the plaintiff solely under its control and supervision in every detail from the beginning to the end is hardly open to question. This is clearly shown by the undisputed testimony of Mr. Lloyd R. Downs, Agricultural Association Manager of plaintiff, who had served in such capacity for more than eight years, or since the time of plaintiff's organization. He stated: "We furnish the foundation seed. In many instances we furnish our corn planters and our own farm tractors and we supervise it all. By contract agreement he [the farmer] cultivates the corn. We in turn grow this corn, go through and pick out the untrue plants and cut them out. We will stake the fields as to the female and male plant. We plant six rows of female, that is the single cross, two rows of another single cross, which we have predetermined will be the male. We must properly identify them so we will not detassel the male corn. We must stake the rows for identification. We use our own detasseling equipment, and we employ and supervise all the labor. We own our own equipment, personally pick all of the corn and bring it to the members' plant * * *." This witness further testified that the grower did not deliver the seed to plaintiff's plant but that plaintiff's employees went to the fields, harvested it and brought it into the plant; that the harvest took place between September 1 and November 1, but not later than the latter date in order to prevent freezing; that the grower was obligated to follow plaintiff's advice and supervision, and that the crop was being grown for the association from the time the seed was delivered to the grower. The testimony of Mr. John P. Gallahue, a "grower" and a party to one of the agreements in the record, is also illuminating as to the relation of the parties. He testified among other things that as a grower he had nothing to say as to when the seed furnished by plaintiff was to be planted, nothing to say as to when the crop should be harvested, and that all these matters, as well as the growing of the crop, were determined by and under the supervision of the plaintiff.

While it is not necessary to determine the precise legal nature of the relation which existed between plaintiff and "the grower," we think it comes nearer being a service or employment contract than anything else. The farmer was employed to render certain services in the growth of a crop on his own land under the sole supervision and control of plaintiff who furnished the seed, fertilizer, equipment, as well as much of the labor, including all technical and skilled labor. Plaintiff and not the farmer was the real owner of the crop from its inception. to the extent of the compensation which True, the farmer had an interest, but only the contract provided for his services and the use of his land.

Defendant's contention that the farmer produced and sold corn to plaintiff is based on the following provision of the agreement: "The grower may sell his corn any time between December 1, 1942 and May 1, 1943. The association agrees to pay the grower in addition to the advances made for the payment of personnel used in the supervision, thinning, and detasseling, for all corn accepted by the association." The basis for determining the amount to be paid is the market price paid for corn at the local elevator on the day that the association "receives notice from the grower to sell." The provision also states, "Any corn unsold on May 1, 1943 will be settled for on basis of the market close of that day." This provision standing alone may lend color to defendant's contention, but when the agreement is considered as a whole, it appears plain that such was not the case and that this provision was mere-

ly a formula for determining the amount of compensation which the grower should receive for the use of his land and for services rendered. And it was favorable to the grower inasmuch as he was enabled to select the day between the dates mentioned when corn was the best price on the market.

But even if this contract be regarded as one of sale, we are unable to discern how receipt of the corn at plaintiff's plant was delivery to a terminal market. Assuming that ownership of the corn was in the grower, contrary to what we think, there was no delivery by the grower. As already noted, the undisputed fact is that plaintiff went into the field, picked the corn and brought it in to its own plant. Assuming further, contrary to the proof, that the grower delivered the corn to plaintiff, there was no sale at that time. As already shown, the corn was picked and brought in sometime between September 1 and November 1, and under the agreement the grower was not entitled to elect to sell before December 1, and might delay such election until the following May 1.

We are unable to perceive any basis for the argument that plaintiff's plant was a terminal market because it was a grower's market. If it was any kind of a market, it was that of the plaintiff and not the grower. Neither did the grower at the time the corn was received at plaintiff's plant part "with economic interest in and control over its future form or destiny." It is true the grower had no such control over the corn after it was received at plaintiff's plant, but it is equally true that he had no such control before it was received. And certainly the grower did not part with his "economic interest" in the corn at the time of its receipt by plaintiff, which was prior to November 1 at the latest, while the grower was not entitled to be compensated before December 1 at the earliest, and it might be as late as the following May 1. It is likely that the corn was processed as hybrid seed corn and made ready for delivery to plaintiff's members prior to the earliest date when the grower was entitled to his pay, and certainly long before the latest day. Thus, the premise upon which the Burger case rests does not here exist and

that decision is without application. Here, there was no grower's market and, therefore, no terminal market, and consequently the processing operations in dispute were not performed after delivery to such a market.

While we think that the rule announced in the Burger case is not applicable here and consequently disagree with the theory upon which the lower court decided in favor of the defendant, we also are not able to accept plaintiff's contention as to why the judgment should be reversed. Plaintiff's theory appears to rest on the premise that it as a cooperative was acting for and on behalf of its contract growers of corn. Thus it is argued that if the services in question had been performed by the grower on his farm they would have constituted agricultural labor and, therefore, would be exempt, and that inasmuch as the services rendered by the plaintiff were for and on behalf of the grower they are likewise exempt. Numerous cases are cited in support of this reasoning, such as Matter of Lazarus, 268 App.Div. 547, 52 N.Y.S.2d 682; Cache Valley Turkey Growers Ass'n v. Industrial Commission, 106 Utah 1, 144 P.2d 537; Industrial Commission v. United Fruit Growers Ass'n, 106 Colo. 223, 103 P.2d 15; Yakima Fruit Growers' Ass'n v. Henneford, 182 Wash. 437, 47 P.2d 831, 833, 100 A.L.R. 435. Without discussing these and similar cases in detail, it is sufficient to note that they in one form or another are based upon the premise that the services were rendered for and on behalf of the farmer or grower, and services rendered by a growers' cooperative have been found to be in that category.

The fallacy of this position is that plaintiff was not a grower's cooperative. It was a cooperative of and acting for and on behalf of its 12,000 members, who were buyers and users of seed corn, and not on behalf of the 20 to 30 farmers with whom it made annual contracts. As is stated in plaintiff's brief: "Appellant is an agricultural cooperative. It exists for the benefit of its members who are farmers engaged in the growing of commercial corn for the commercial market. The sole object of appellant's existence is to provide its mem-

bers, as commercial corn growers, with high quality hybrid corn seed to be used for the growing of the next commercial crop. All that it does is for the benefit of its members, and in accomplishing its objective it serves them as producers of corn for sale on the commercial market."

While the record indicates that the 20 to 30 farmers with whom plaintiff had contracts were among its 12,000 members, that was coincidental. There was nothing, so far as we are aware, which required it to contract only with its own members, but in any event, as noted, it is not open to dispute but that it represented the buyers and users of hybrid seed corn and not those who by contract assisted in its production.

In view of what we have said, we think none of the authorities are applicable to the situation before us, and certainly none of them are controlling. Having concluded that there was no "delivery to a terminal market for distribution for consumption," Par. (h) (4) must be considered as though it contained no such provision. The paragraph defines "Agricultural labor" as including all services performed "in handling, planting, drying, packing, packaging, processing, freezing, grading, storing," which obviously includes the labor involved in the instant case. The paragraph, however, limits the services enumerated by providing, "but only if such service is performed as an incident to ordinary farming operations". The question for decision, therefore, is dependent upon whether the services in dispute were "performed as an incident to ordinary farming operations". We think they were.

We doubt if there is anything more important to successful farming as it relates to the growing of a commercial corn crop than the use for seed of a high quality hybrid corn. As this record shows, the production of such seed is a process which requires several years and involves much skill and knowledge, some of which is highly technical. From the beginning of the process to the end, many services are performed. In the instant case, such services included those performed under the grower contracts, which admittedly are agricultural labor. The services also included those performed by plaintiff at its plant as an essential prerequisite to the final preparation of hybrid seed to be delivered to and used by those on whose behalf plaintiff was authorized to act.

If the individual farmer produced his own hybrid seed, we suppose no question could be made but that all services performed in connection therewith would be agricultural labor within the terms of the statute, and if he directly employed others to perform all or some part of the necessary labor, we think the character of such labor would not be changed. In the instant situation, if the 12,000 farmers comprising plaintiff's membership had collectively or in groups or as individuals entered into contracts with the growers for the production of corn in the same manner as did the plaintiff, we think it would hardly be open to question but that the services rendered by the growers, as well as those rendered by the farmers after receipt of such corn from the growers, would constitute agricultural labor. Here, instead, these 12,000 farmers engaged plaintiff to perform for them a service which would not be practical for them to render for themselves as individuals. Every service rendered by the plaintiff in the process of producing hybrid corn, whether on the land or in its plant, was for and on behalf of its farmer members and was a service essential to their farming operation. To hold that such services were not "an incident to ordinary farming operations" would, in our view, require us to ignore the realities of the situation and to embrace the mythical. In our judgment, plaintiff was entitled to recover.

The judgment appealed from is, therefore, reversed and the cause remanded, with directions to proceed accordingly.

KERNER, Circuit Judge (dissenting).

In this case plaintiff, before the corn was harvested, rejected that corn which was unfit for seed purposes, and took physical possession in the field of the fit corn and transported it to its plants. The tax that was assessed was only with respect to services *after* the accepted or fit corn seed reached plaintiff's plant for distribution.

That being so, the plant was the terminal market.

It seems to me that *after* the corn was removed from the farms of the various growers and had been delivered to plaintiff's plant, plaintiff's activity or work was processing, marketing, and selling seed. The services performed were commercial rather than agricultural. And the fact that plaintiff is a co-operative association is immaterial. It must be treated the same as any other individual or corporation.